847 A.2d 1261

DENNIS DEANGELIS, PLAINTIFF–RESPONDENT, v.
JAMES F. HILL, DEFENDANT–APPELLANT.

Argued December 2, 2003—Decided May 11, 2004.

*John C. Connell,* argued the cause for appellant (*Archer & Greiner,* attorneys).

*Kevin C. Corriston,* argued the cause for respondent (*Breslin and Breslin,* attorneys).

Justice WALLACE delivered the opinion of the Court.

In this defamation case, plaintiff, a police officer, claims that defendant defamed him by publishing a newsletter accusing him of perjury. The Law Division denied defendant's motion for summary judgment, and the Appellate Division denied defendant's motion for leave to appeal. We granted leave to appeal, 177 *N.J.* 487, 828 *A.*2d 915 (2003), and now reverse because plaintiff failed to demonstrate the required "actual malice" necessary to maintain a defamation action by a public official.

## I.

This appeal arises from a parking dispute between defendant, James Hill, and the Township of Woodcliff Lake Police Department. Woodcliff Lake has an ordinance that prohibits parking on its streets between 2:00 a.m. and 6:00 a.m. In December 1999, defendant received permission from the police to park his trailer on the street in front of his home for three days, after which he planned to drive the trailer to Florida. He contacted Woodcliff Lake Administrator Jack Doyle on December 21, 1999, and requested an extension of time to park the trailer on the street until

approximately January 6, 2000. Doyle could not respond immediately to defendant's request, but indicated he would call back.

Later that day, defendant traveled to Pennsylvania and left the trailer parked on the street in front of his home. He planned to return on December 24, 1999. While defendant was away, Doyle called and informed defendant's wife that the police chief would not extend permission to park the trailer on the street. Defendant's wife explained that defendant would be away from home until December 24, 1999, and Doyle then agreed that the trailer could remain parked on the street until then.

Defendant returned home a day early and contacted the mayor's office to obtain a copy of the overnight parking ordinance. Thereafter, defendant wrote a letter thanking the mayor for her assistance and complaining about the treatment he received from the police. However, defendant continued to leave his trailer parked on the street.

On December 27 and 28, 1999, defendant received parking summonses for violating the overnight parking ban. He called the police dispatcher on December 28, 1999, to again request permission to park his trailer overnight on the street. After checking with the tour commander, the dispatcher informed defendant that his request was denied. Defendant questioned the denial, because despite the ordinance he had previously received permission to park on the street. The dispatcher offered to send an officer to speak with defendant and defendant agreed. Unknown to the dispatcher, defendant tape-recorded this conversation.

Plaintiff, Woodcliff police officer Dennis DeAngelis, was dispatched to defendant's house. Plaintiff did not know defendant personally, but he was aware of the parking dispute. During the conversation, which defendant taped without plaintiff's knowledge, plaintiff stated he was under strict orders from his supervisors not to give permission to park overnight on the street and that he would have to issue a summons if the trailer was on the street during the prohibited hours. Defendant continued to question plaintiff about the apparently inconsistent enforcement of the

overnight parking ban. Before leaving, plaintiff explained that he lacked authority to approve defendant's request. Subsequently, plaintiff prepared an offense report describing the encounter with defendant.

In January 2000, defendant wrote a letter to the mayor, complaining about the parking problem. He also submitted an advertisement to a local newspaper describing the inconsistent enforcement of the parking ban. Defendant did not receive a response from the mayor and the newspaper refused to publish the advertisement.

In February 2000, defendant sent plaintiff a letter claiming that plaintiff's offense report was inaccurate and included a copy of the tape-recorded conversation. Plaintiff did not respond to defendant. Defendant then wrote a letter to the mayor, reiterating his concerns about enforcement of the parking ban and plaintiff's "falsely concocted" report.

In May 2000, defendant appeared *pro se* in municipal court to defend against the parking summonses. He called plaintiff as a witness and questioned him about several of the recorded statements from their conversation of December 28, 1999. Plaintiff denied making those statements. The judge ultimately found defendant guilty of the parking violations.

Thereafter, defendant requested that the Attorney General and the Bergen County Prosecutor pursue charges of perjury against plaintiff based on alleged discrepancies between plaintiff's testimony at the municipal court proceeding and the tape recording of the December 28, 1999, encounter. Neither office took action on defendant's requests.

In early April 2001, defendant published a newsletter and distributed it to every home in Woodcliff Lake. The large print headline at the top of the first page of the newsletter read: "Woodcliff Lake Police Accused of Perjury." Underneath the headline was an underlined statement: "Prosecutor and Attorney General receive complaint along with secret tape recording." The

first paragraph of the newsletter provided: "Woodcliff Lake police committed perjury in a trial held in the top municipal court for the Woodcliff Lake area, it has been alleged by a Woodcliff Lake resident in letters to the Bergen County prosecutor and the N.J. attorney general's office." The next paragraph of the newsletter described the events leading up to the December 28, 1999, encounter between defendant and plaintiff. The newsletter then declared that defendant's tape recording of that encounter "contains statements [plaintiff] later denied under oath having made during [defendant's] trial."

The second page of the newsletter contained several examples of the alleged discrepancies between plaintiff's testimony in court and the recorded statements of their encounter:

EXAMPLE # 1: *Dec. 28, 1999, direct quotes from tape at home of [defendant]:*
[Plaintiff]: "I can't give you [defendant] permission to do so (park overnight) ... I'm under strict orders from my superiors not to give any permission for that ... We have a board up there with a lot of notes from superiors and all of them are sergeants ... and that's specifically on there not to give any permission out...."

Q. [Defendant]: "There is nobody in Woodcliff Lake right now that has a car parked overnight?"

A. [Plaintiff]: "I'm not saying that ... I'm saying for this trailer ... I'm saying that I have orders specifically on the (your) vehicle ... other vehicles on the—on the street, by the way, if they are left on the street without permission are summonsed. They're written up."

Q. [Defendant]: Have you got (other vehicles) out there that have permission to be out overnight?"

A. [Plaintiff]: "For tonight? I'd have to check with the dispatcher ... If you want I can check ..."

*May 26, 2000, direct quotes from trial testimony:*

Q. [Defendant]: "Did you, [plaintiff], tell me, tell the defendant at his home, that you had specific orders from your superiors that I ..., the defendant, was not to be allowed to continue to park his camper overnight in front of his house in Woodcliff Lake ... that you had specific orders from your superior that that was not allowed?"

A. [Plaintiff]: "The specific orders were for the town, just to enforce the overnight parking, to ban overnight parking."

EXAMPLE # 2: *Dec. 28, 1999, direct quotes from tape at home of [defendant]:*
[Plaintiff]: "Okay ... you [defendant] were given (police) permission (to park overnight) for two nights until Dec. 23 ..."

*May 26, 2000, direct quotes from trial testimony:*

Q. [Defendant]: "Did you [plaintiff] say to the defendant when you visited his home that you were aware that the police had granted permission for the defendant to park overnight for a certain number of days in front of his home?"

A. [Plaintiff]: "No... No."

*EXAMPLE # 3: Dec. 28, 1999, direct quotes from tape at home of [defendant]:*

[Plaintiff]: "Jack Doyle (Borough Administrator), as far as I know, he came over and whatever conversation was between him and the chief (Poliey), permission (for [defendant] to park overnight), as far as I was concerned, was denied."

*May 26, 2000, direct quotes from trial testimony:*

Q. [Defendant]: "Did you [plaintiff] say to the defendant that you were aware that Jack Doyle had gone to see Chief Poliey about an extension of the police privilege to park overnight and that that was denied to me? Did you say that to the defendant?"

A. [Plaintiff]: "No."

*The following material is a further report and commentary by [defendant]:*

[Plaintiff] filed an official police department "Offense Report" on his visit to the [defendant's] home on December 28, 1999. In this report, and contrary to his subsequent sworn court testimony, he wrote:

"This officer [plaintiff] reiterated (to [defendant]) that he was under strict orders not to give overnight parking permission for this [defendant's] vehicle."

The remainder of the newsletter contained a discussion related to asserted perjury by police officers and other public officials locally and throughout the country. It further declared that "Mayor Higgins and the [B]orough council should be called to account for their roles *if police perjury becomes proven.*" (Emphasis added).

Plaintiff filed a complaint against defendant seeking compensatory and punitive damages based on claims of defamation, false light, intentional infliction of emotional distress, negligent infliction of emotional distress, harassment and actual malice. Defendant filed a timely answer and discovery followed.

In his deposition, plaintiff stated that he thought the newsletter was "pretty damaging to [his] reputation, [and his] rapport with the community." Plaintiff also claimed that the publication caused him "[l]oss of sleep, stress, [and] embarrassment," but he admitted that he did not seek medical treatment or counseling. He stated that following publication of the newsletter, he was subjected to practical jokes by fellow officers. However, the newsletter did not affect his relationship with his co-workers in any other way. Plaintiff also admitted he did not suffer any specific financial loss

as a result of the newsletter. He noted that although he was not promoted, he did not know whether the newsletter had anything to do with that.

Defendant moved for summary judgment. In his statement of material facts, defendant essentially recited the facts noted herein. Defendant argued that plaintiff failed to prove by clear and convincing evidence that defendant acted with actual malice and that the publication was simply an opinion based on the facts. In opposing the motion, plaintiff did not dispute the material facts set forth by defendant, but alleged he was subsequently harassed and embarrassed by defendant's accusations. Plaintiff argued there was sufficient evidence of actual malice for a jury to decide whether the publication was made with some form of wrongful motive or ill will.

The trial court dismissed plaintiff's claims for negligent infliction of emotional distress and harassment. However, the court denied defendant's motion for summary judgment on the remaining claims, summarily rejecting defendant's argument that the alleged defamatory statements were non-actionable opinion. The court found evidence of actual malice based on defendant's motive to discredit plaintiff and concluded that the underlying facts were disputed. Also, the court expressed concern about plaintiff's contention that "there may have been portions of the tape which were not disclosed." The court explained that summary judgment was not appropriate because there were disputed material issues of fact regarding whether plaintiff had a constitutional right of privacy in the secret recording of his conversation, and whether there was intentional infliction of emotional distress "because those issues depended on an assessment of the state of mind of the defendant."

## II.

### A.

Summary judgment is appropriate when "there is no genuine issue as to any material fact ... and ... the moving party

is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c). In viewing a defendant's motion for summary judgment, we must view the facts in the light most favorable to the plaintiff. *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146, 156 (1995). "When the evidence is 'so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment." *Ibid.* (citation omitted).

■ This Court has recognized that "summary judgment practice is particularly well-suited for the determination of libel [and defamation] actions" because those actions tend to "inhibit comment on matters of public concern." *Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 104 *N.J.* 125, 157, 516 *A.*2d 220, 236 (1986); *see also* Pressler, *Current N.J. Court Rules*, comment on *R.* 4:46–2 (2003) (compiling cases supporting use of summary judgment in defamation actions). The summary judgment standard is encouraged in libel and defamation actions because "[t]he threat of prolonged and expensive litigation has a real potential for chilling ... criticism and comment upon public figures and public affairs." *Kotlikoff v. Community News*, 89 *N.J.* 62, 67, 444 *A.*2d 1086, 1088 (1982); *see also Costello v. Ocean County Observer*, 136 *N.J.* 594, 605–06, 643 *A.*2d 1012, 1017–18 (1994). Accordingly, when a public figure is the plaintiff in a defamation case, "the court should grant summary judgment dismissing the complaint if a reasonable jury could not find that the plaintiff had established actual malice by clear and convincing evidence." *Lynch v. New Jersey Educ. Ass'n*, 161 *N.J.* 152, 169, 735 *A.*2d 1129, 1137 (1999).

## B.

Generally, "[t]he law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." *Ward v. Zelikovsky*, 136 *N.J.* 516, 528, 643 *A.*2d 972, 978 (1994). Our courts have defined defamation consistently with section 559 of the *Restatement (Second) of Torts* (1977). *Ward, supra*, 136 *N.J.* at 529, 643 *A.*2d at 978. The Restatement provides that in addition to damages, the elements of a defamation

claim are: (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher. *Restatement (Second) of Torts, supra,* § 558. When the plaintiff is a public official, plaintiff must establish that the defendant knowingly or with reckless disregard for the truth published false statements. *Id.* § 580A. Courts have referred to this standard as "actual malice." *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706–07 (1964); *Lawrence v. Bauer Publ'g & Printing Ltd.,* 89 *N.J.* 451, 462, 446 *A.*2d 469, 475, *cert. denied,* 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 395 (1982).

█ To satisfy the actual malice standard, plaintiff must establish by clear and convincing evidence, *Sullivan, supra,* 376 *U.S.* at 285–86, 84 *S.Ct.* at 729, 11 *L.Ed.*2d at 710, that defendant published the statement with "knowledge that it was false or with reckless disregard of whether it was false," *id.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706–07. In order to demonstrate the reckless disregard element, plaintiff must show that the statements were published with a "high degree of awareness of their probable falsity," *Garrison v. Louisiana,* 379 *U.S.* 64, 74, 85 *S.Ct.* 209, 216, 13 *L.Ed.*2d 125, 133 (1964), or with "serious doubts as to the truth of [the] publication," *St. Amant v. Thompson,* 390 *U.S.* 727, 731, 88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262, 267 (1968).

█ "The heightened actual-malice standard exists for public officials because otherwise 'would-be critics of official conduct may be deterred from voicing their criticism.'" *Costello, supra,* 136 *N.J.* at 614, 643 *A.*2d at 1022 (quoting *Sullivan, supra,* 376 *U.S.* at 279, 84 *S.Ct.* at 725, 11 *L.Ed.*2d at 706). This standard is subjective, *id.* at 615, 643 *A.*2d at 1022–23, and applies to a media defendant as well as a private individual, *Dairy Stores, Inc., supra,* 104 *N.J.* at 153, 516 *A.*2d at 234.

█ Generally, words that subject a person to ridicule or contempt, or "that clearly 'sound to the disreputation' of an

individual are defamatory on their face." *Lawrence*, 89 *N.J.* at 459, 446 *A.*2d at 473 (citation omitted). A publisher's hostility or ill will is not dispositive of malice. *Lynch, supra,* 161 *N.J.* at 166, 735 *A.*2d at 1136. Although "[s]pite, hostility, hatred, or the deliberate intent to harm demonstrate possible motives for making a statement," only evidence demonstrating that the publication was made with knowledge of its falsity or a reckless disregard for its truth will establish the actual malice requirement. *Id.* at 166–67, 735 *A.*2d at 1136.

"Whether the statement is susceptible of a defamatory meaning is a question of law for the court." *Ward, supra,* 136 *N.J.* at 529, 643 *A.*2d at 978. In making this determination, courts must consider three factors: (1) the content, (2) the verifiability, and (3) the context of the challenged statement. *Ibid.*

The "content" analysis requires courts to consider the " 'fair and natural meaning that will be given [to the statement] by reasonable persons of ordinary intelligence.' " *Ibid.* (quoting *Romaine v. Kallinger,* 109 *N.J.* 282, 290, 537 *A.*2d 284, 288 (1988)). The use of epithets, insults, name-calling, profanity and hyperbole may be hurtful to the listener and are to be discouraged, but such comments are not actionable. *Id.* at 529–30, 643 *A.*2d at 978–79. Courts are required to differentiate between defamatory statements and "obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse." *Id.* at 530, 643 *A.*2d at 979 (quoting Rodney A. Smolla, *Law of Defamation,* § 4.03, at 4–10 (1986)).

An analysis of verifiability requires courts to determine whether the statement is one of fact or opinion. *Ibid.* "Statements of opinion, as a matter of constitutional law, enjoy absolute immunity." *Dairy Stores, Inc., supra,* 104 *N.J.* at 147, 516 *A.*2d 220. A factual statement can be proved or disproved objectively while an opinion statement generally cannot. Only if the statement "suggested specific factual assertions that could be proven true or false could the statement qualify as actionable defamation." *Ward, supra,* 136 *N.J.* at 531, 643 *A.*2d at 972. The

more fact based the statement, the greater likelihood that it will be actionable. *Id.* at 531–32, 643 *A.*2d at 979–80. Conversely, where the statement consists of "[l]oose, figurative or hyperbolic language, [it] will be . . . more likely to be deemed non-actionable as rhetorical hyperbole or a vigorous epithet." *Id.* at 532, 643 *A.*2d at 980 (quotation marks and citation omitted).

In respect to context, courts must consider "[t]he listener's reasonable interpretation, which will be based in part on the context in which the statement appears. . . ." *Ibid.* That is, in addition to the language, courts must examine "the context in which the statement appears" to determine whether the statement was capable of a defamatory meaning. *Ibid.*

## III.

Defendant contends that plaintiff failed to establish that the statements were made with actual malice or that plaintiff suffered damages. Plaintiff does not dispute that he is a public official and subject to the heightened actual malice standard. However, he asserts that there are genuine issues of material fact concerning whether defendant published the newsletter with actual malice. In order to dispose of the defamation claim, we need only address the actual malice issue.

## A.

Two prior cases decided by this Court are particularly instructive to our evaluation of the defamation claim here. First, in *Lawrence, supra,* the plaintiffs were officers of a local taxpayers association that opposed a municipal appropriation to construct a new firehouse. 89 *N.J.* at 455, 446 *A.*2d at 470–71. In order to force a public referendum on the issue, the plaintiffs produced a petition with over 5,000 signatures. *Ibid.* Defendants were informed by a local official, a newspaper's publisher, editor, and a reporter, that there were questions regarding the validity of the signatures and that there was an on-going investigation. *Id.* at

455–56, 446 A.2d at 470–71. Thereafter, the defendants published an article with the headline "City Attorney rules association petitions improper; forgery charges may loom for [the plaintiffs]." *Id.* at 456, 446 A.2d at 471. The plaintiffs requested a retraction and the defendants responded by publishing a second article defending the allegations in the first. *Ibid.*

After finding that the defendants' statements were defamatory as a matter of law, *id.* at 459–60, 446 A.2d at 473, and that the plaintiffs were public officials, *id.* at 462–65, 446 A.2d at 474–76, the Court found that the plaintiffs failed to demonstrate actual malice, *id.* at 467, 446 A.2d at 477. Specifically, the Court reasoned that, despite the fact that the defendants could not prove that the charges in the articles were true, *id.* at 460–461, 446 A.2d at 473–74, the "defendants honestly believed that the concededly misleading statements published in the two articles were true," *id.* at 467, 446 A.2d at 477. Therefore, the plaintiffs did not establish actual malice. *Ibid.*

Second, in *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 N.J. 392, 396, 655 A.2d 417 (1995), *cert. denied,* 516 U.S. 1066, 116 S.Ct. 752, 133 L.Ed.2d 700 (1996), the defendants, the Bergen Record Corporation and certain of its employees, published a special report that accused Turf of deceptive business practices. The report included quotes from Turf's former employees, customers, and a competitor, *id.* at 397, 655 A.2d at 419–20, but failed to disclose that the former employees had been fired, *id.* at 420, 655 A.2d at 431. The article revealed that several reporters deliberately brought mowers to the company for simple repairs, and "[e]ach time, Turf recommended or performed unnecessary work." *Id.* at 397, 655 A.2d at 419. Even though Turf was not a public official, the Court applied the actual malice standard because the report included allegations of consumer fraud, *id.* at 423, 655 A.2d at 433, which the Court concluded was a matter of legitimate public interest, *id.* at 416–18, 655 A.2d at 429–31.

The Court accepted Turf's expert's criticisms of the article. The expert noted: 1) the defendants' selectively used portions of a tape recording and destroyed portions of the tapes; 2) the defendants failed to mention that in a ten-year business period only five complaints had been filed against Turf and all had been resolved in its favor; and 3) the independent tests "were devoid of validity, reliability and other requirements of scientific method and experimental design." *Id.* at 424–25, 655 *A.*2d at 434. The Court found most of the criticism of the article to be justified, particularly the expert's comments about the omission of relevant information and the reliance on biased sources. *Id.* at 425, 655 *A.*2d at 434. Nonetheless, the Court concluded that "[Turf] . . . failed to prove that [the defendants] ever doubted that Turf's conduct constituted serious consumer fraud practices." *Id.* at 426, 655 *A.*2d at 434. Therefore, Turf failed to establish actual malice. *Ibid.*

### B.

■■■ Here, we must determine whether a reasonable factfinder could find by clear and convincing evidence that defendant published the newsletter with actual malice. Plaintiff seeks to demonstrate actual malice by referring to defendant's motive for publishing the newsletter. The trial court accepted that argument, finding that plaintiff presented sufficient evidence of actual malice because the dispute between defendant and the Township provided a motive for "defendant to strike back at the police officer."

■■■ We disagree. Actual malice has "nothing to do with hostility or ill will; rather it concerns [a] publisher's 'state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it.'" *Lawrence, supra,* 89 *N.J.* at 468, 446 *A.*2d at 477 (quoting *Herbert v. Lando,* 441 *U.S.* 153, 199–200, 99 *S.Ct.* 1635, 1660–61, 60 *L.Ed.*2d 115, 148–49 (1979) (Stewart, J., dissenting)); *accord Lynch, supra,* 161 *N.J.* at 166, 735 *A.*2d at 1136. The existence of actual malice depends on whether defendant published the article knowing that it was false or with a

reckless disregard for its truth. *Lynch, supra,* 161 *N.J.* at 166–67, 735 *A.*2d at 1136–37. Although defendant was clearly upset with plaintiff and the Woodcliff Lake Police Department, plaintiff's evidence does not suggest that defendant doubted that his statements in the newsletter were true.

Plaintiff further contends that defendant's failure to state in the newsletter that plaintiff had not been charged with perjury supports a finding of actual malice. It is undisputed that the newsletter omitted that information. If defendant's newsletter had stated or implied that plaintiff had been charged with perjury, then that omission might have demonstrated actual malice sufficient to defeat summary judgment. However, the newsletter only "accused" plaintiff of perjury just as the articles in *Lawrence* only stated the plaintiffs "may" be charged with forgery. Although the headline may have suggested that defendant filed a formal complaint, the newsletter later clarified that defendant merely sent letters to the prosecutor and Attorney General complaining about plaintiff's conduct. Therefore, a reasonable person reading the entire newsletter would recognize that the accusation was not based on formal perjury charges. Thus, neither the absence of formal perjury charges against plaintiff, nor defendant's failure to publish that fact, provided sufficient proof of actual malice to avoid summary judgment.

Further, plaintiff asserted that if the unrecorded portions of the conversation had been included in the newsletter, it would have provided a more accurate and fair description of the conversation. The trial court accepted this argument and denied summary judgment, ruling that the underlying facts were disputed, relying specifically on plaintiffs contention that "there may have been portions of the tape which were not disclosed."

We find no merit in plaintiff's argument. Plaintiff alleged that the substance of the unrecorded portions of the conversation concerned the comment about "military [b.s.]," and defendant did not directly dispute that claim. Thus, it is questionable that the "omitted portions" of the conversation were either disputed or

material. Moreover, plaintiff did not suggest why the omitted portions of the taped conversation were material to the actual malice determination other than to state that their inclusion would have created a "more fair and accurate" description. Even if we accept that allegation as true, it is insufficient to meet plaintiff's heavy burden of proving actual malice by clear and convincing evidence. Just as the omission of the recorded statements from the publication in *Turf Lawnmower* did not provide clear and convincing evidence of actual malice, the omitted portions of the taped conversation here are insufficient to demonstrate actual malice.

In sum, viewing the evidence in the light most favorable to plaintiff, we conclude that no reasonable fact finder could find by clear and convincing evidence that defendant knew his publication was false or that he published the newsletter with reckless disregard for its truth. On the contrary, the evidence clearly demonstrated that defendant believed the statements were true. Thus, it was error to deny defendant's motion for summary judgment on the defamation count.

## IV.

Defendant argues that the trial court erred by failing to dismiss the false light count. Plaintiff's false light claim was based on an asserted constitutional right of privacy violated by defendant's secret tape-recording of the December 28, 1999, conversation.

In order to succeed on a false light claim, plaintiff must demonstrate that:

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

[*Romaine, supra,* 109 *N.J.* at 294, 537 *A.2d* at 290 (quoting *Restatement (Second) of Torts, supra,* § 652E).]

A false light claim against a public official, similar to a defamation claim, utilizes the actual malice standard. *Hornberger v. Ameri-*

*can Broad. Co.,* 351 *N.J.Super.* 577, 598, 799 *A.2d* 566, 578 (2002); *Restatement (Second) of Torts, supra,* § 652E comment d. Accordingly, defendant is entitled to summary judgment on this issue because plaintiff failed to prove that defendant acted with actual malice.

## V.

Lastly, defendant argues that the trial court erred by failing to dismiss the intentional infliction of emotional distress claim.[1]

In order for plaintiff to prevail on an intentional infliction of emotional distress claim, he must show: (1) intentional conduct; (2) the conduct was extreme and outrageous; (3) the conduct proximately caused plaintiff's emotional distress; and (4) the emotional distress was severe. *Buckley v. Trenton Sav. Fund Soc'y.,* 111 *N.J.* 355, 366, 544 *A.2d* 857, 863 (1988). Additionally, as a public plaintiff, similar to the defamation and false light claims, plaintiff must also show actual malice. *Hustler Magazine v. Falwell,* 485 *U.S.* 46, 56, 108 *S.Ct.* 876, 882, 99 *L.Ed.2d* 41, 53 (1988); *Decker v. Princeton Packet Inc.,* 116 *N.J.* 418, 432, 561 *A.2d* 1122, 1129 (1989) (noting that federal courts have found that, "the [F]irst [A]mendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation").

We note that beyond the failure to establish actual malice, plaintiff's proof of emotional distress was limited to his testimony that he was embarrassed, stressed, lost sleep, and subjected to practical jokes by fellow officers. Plaintiff did not seek medical or psychological treatment, nor did he suggest that the incident seriously affected his relationship with coworkers or prevented him from performing his job or other daily routines. We have recognized previously that such general maladies do not rise to the

---

[1] Plaintiff does not challenge the trial court's dismissal of the *negligent* infliction of emotional distress claim. (Emphasis added).

level of severe distress required in an emotional distress claim. *Buckley, supra,* 111 *N.J.* at 368, 544 *A.*2d at 864 (holding "aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" insufficient as a matter of law to support a finding of severe mental distress). The undisputed evidence demonstrates that plaintiff did not suffer the kind of severe or debilitating emotional distress that would entitle him to damages for intentional infliction of emotional distress.

Consequently, the trial court erred in denying defendant's motion to dismiss the count for intentional infliction of emotional distress.

## VI.

We reverse and remand to the trial court for dismissal of the complaint.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.