988 A.2d 1201 (2010)
412 N.J. Super. 76
John C. BERKERY, Sr., Plaintiff-Appellant,
v.
ESTATE OF Lyle STUART, both individually, and as President of Barricade Books, Inc., Allen M. Hornblum, Barnes & Noble, Inc., Amazon.Com, Inc., Barricade Books, Inc. (N.Y.), Barricade Books, Inc. (NJ), National Book Network, Inc., Rowman & Littlefield Publishing Group, Inc., Borders, Inc., Borders Group, Inc., Defendants-Respondents.
Docket No. A-5105-07T1
Superior Court of New Jersey, Appellate Division.
Submitted December 1, 2009.
Decided February 19, 2010.
*1203 John C. Berkery, Sr., appellant pro se.
Montgomery, McCracken, Walker & Rhoads, LLP, attorneys for respondents (Gregory M. Harvey, of the Pennsylvania Bar, admitted pro hac vice, and Kristen E. Polovoy, on the brief).
Before Judges CARCHMAN, LIHOTZ and ASHRAFI.
The opinion of the court was delivered by
CARCHMAN, P.J.A.D.
In a second attempt to obstruct the publication of a book that is critical of his conduct, plaintiff John C. Berkery appeals from the summary dismissal of his action against defendantsauthor Allen M. Hornblum, and distributors Barnes & Noble, Inc., Amazon.Com, Inc., Barricade Books, Inc. (N.Y.), Barricade Books, Inc. (NJ), National Book Network, Inc., Rowman & Littlefield Publishing Group, Inc., Borders, Inc. and Borders Group, Inc. In granting summary judgment, Judge Fernandez-Vina concluded that no reasonable jury could conclude that these defendants acted with actual malice.
On appeal, plaintiff argues that the judge erred in concluding that plaintiff did not establish actual malice on the part of the author and distributors. He contends that several statements that were made about him in the book are patently false, and that the author is a "reckless researcher and a proven liar."
Previously, in Berkery v. Kinney, 397 N.J.Super. 222, 936 A.2d 1010 (App.Div.2007), certif. denied, 194 N.J. 445, 945 A.2d 1289 (2008) (Berkery I), plaintiff sued a journalist and her publisher regarding statements made in newspaper articles about plaintiff's efforts to stop the same publication involved in this litigationConfessions of a Second Story Man: Junior Kripplebauer and the K & A Gang (Confessions), a book about the activities of a group of criminals in Philadelphia during the 1950s and 1960s. In Berkery I, we affirmed the trial court's summary dismissal of plaintiff's complaint, holding that plaintiff had failed to submit sufficient evidence from which a jury could conclude the defendants acted with actual malice.
Although plaintiff argues that the legal standard set forth in Berkery I should not be applied here, we disagree. Here, plaintiff failed to present clear and convincing *1204 evidence from which a reasonable jury could have concluded that defendants acted with actual malice. His proffered proofs, which consisted of self-serving denials and irrelevant accusations, failed to satisfy his burden. We now affirm.
These are the facts adduced from the expansive record on the motion for summary judgment. Hornblum is an assistant professor of geography and urban studies at Temple University. In 2001, he began research for a book about the K & A Gang, a group of burglars that operated in the Kensington and Allegheny section of Philadelphia in the 1950s and 1960s. To that end, he attempted to find as many "old-time members" of the gang as possible.
Hornblum contacted plaintiff and arranged to meet him for lunch at a local restaurant.[1] To Hornblum's surprise, plaintiff arrived at the restaurant accompanied by a man whom Hornblum did not know and who made Hornblum feel uncomfortable. At that point, Hornblum decided that it was not necessary to discuss the K & A Gang with plaintiff since plaintiff would only be a "peripheral figure" in the book.
Plaintiff nevertheless learned of Hornblum's plan to write Confessions. In a February 27, 2001 letter, he warned Hornblum to "scrap this mischievous project" or plaintiff would "reap the rewards litigation will surely bring." Notwithstanding this entreaty, Hornblum continued with his research, interviewing several people who claimed to have knowledge of plaintiff's involvement with the K & A Gang. He also amassed a large number of newspaper articles, government documents and police records containing information about plaintiff.
Confessions was initially published by the Temple University Press (the Press) in 2005. On May 28, 2005, plaintiff wrote to that publisher's editor-in-chief, demanding that his name and likeness be removed from the book and threatening legal action if they were not. In response to this letter, the Press put a hold on all future shipments of the book and recalled copies that had already been shipped. Ultimately, it terminated its publishing agreement with Hornblum.
After Hornblum's agreement with the Press fell through, he reached an agreement with defendants Lyle Stuart and Barricade Books, which published Confessions in early 2006. In February 2006, plaintiff sent letters to defendant booksellers, informing them that he had filed a civil complaint against Hornblum and demanding that they stop distributing the book immediately.
Plaintiff filed an amended complaint against Hornblum; book distributors/sellers Barnes & Noble, Inc., Amazon.Com, Inc., National Book Network, Inc., its parent, Rowman & Littlefield Publishing Group, Inc., and Borders Group, Inc.; and publishers Estate of Lyle Stuart, Barricade Books, Inc. (New York) and Barricade Books, Inc. (New Jersey), asserting numerous causes of action based on allegedly defamatory statements set forth in Confessions, in newspaper articles concerning the book and on the Internet website of Barricade Books.
In his amended complaint, plaintiff alleged that he was defamed on at least twenty of Confessions' 273 pages. He cited the following thirteen "facts" set forth in the book as being malicious falsehoods: plaintiff attempted to murder Robert Poulson in Camden County in 1960; *1205 police investigating the assault on Poulson found blood on the back seat of plaintiff's car; police arrested plaintiff and charged him with shooting Poulson; police released plaintiff because they could not "make the charges stick"; six months after Poulson was shot, plaintiff was arrested for the murder of Vincent Blaney; plaintiff was the most likely "candidate" in connection with the car-bombing death of Richard Blaney in 1961; plaintiff robbed the home of a Pottsville, Pennsylvania, coal mine operator and "got away" with $478,000; after plaintiff successfully had his robbery conviction set aside, the only reason plaintiff was not retried was that local authorities "had had enough"; plaintiff was the "main nexus between Irish mobsters and the Mafia"; in 1987 plaintiff was convicted of distributing twenty-four pounds of methamphetamine and possession of more than 200 gallons of phenyl-2-proponane (P-2-P); plaintiff is "particularly dangerous for he combines intelligence and street smarts with a reputation for muscle"; plaintiff has "a cunning and sophistication that has little equal in the Philadelphia criminal community"; and plaintiff was recently released from prison and is now "back on the street."
Plaintiff filed a motion for summary judgment, which was denied. Defendants then moved for summary judgment, which was partially granted, and the judge issued an order dismissing all claims against Hornblum and the book distributors. He also granted summary judgment in favor of the publishers as to all claims arising from statements in Confessions but denied summary judgment as to statements made in the publishers' newsletters and on their website. Plaintiff's subsequent motion for reconsideration was denied, but the parties filed a consent order dismissing the complaint as to the publishers by reason of a settlement.
In support of his motion for summary judgment, plaintiff submitted excerpts from Confessions; correspondence between himself and defendants; court decisions reversing his convictions for robbery and drug trafficking; court records containing his criminal history; the deposition and interrogatory responses of Hornblum; a certification of Jane Golding, a Temple librarian, that impugned Hornblum's research techniques; certifications from himself disputing the accuracy of Hornblum's research; and copies of his resume and college diplomas.
In denying plaintiff's motion, the judge noted that the majority of plaintiff's allegations "as to Mr. Hornblum ... are that he's shown himself to be someone devoid of character, lacking any sort of credibility, a purposeful liar, and manipulator." The judge gave little credence to the allegations set forth in Golding's certification, however, observing that as Hornblum's former girlfriend, she had several motives for criticizing him.
Reasoning that plaintiff achieved pervasive fame and notoriety as the result of his involvement with methamphetamine trafficking and his conspiracy with organized crime figures, the judge concluded that plaintiff is a limited-purpose public figure. He further found that under the standard applied to limited-purpose public figures in defamation actions, plaintiff could prevail only if he showed that defendants acted with actual malice. He concluded that summary judgment in favor of plaintiff was inappropriate because plaintiff had failed to establish that there was no issue of material fact with regard to defendants' malice.
In support of their motion for summary judgment, defendants submitted materials used by Hornblum as information sources. These submissions included a presentence report prepared for the United States District *1206 Court, Eastern District of Pennsylvania, in 1987 that lists plaintiff's convictions going back to age nineteen; two reports of the Pennsylvania Crime Commission, in which plaintiff's name figures prominently; excerpts from three books about organized crime in Philadelphia that mention plaintiff's association with the Mafia; hundreds of newspaper articles about plaintiff's criminal acts; FBI files containing plaintiff's criminal history and an interview with a mob informant who implicated plaintiff in a murder; handwritten notes of Hornblum's interviews with informants; the sentencing memorandum submitted by the United States following plaintiff's conviction for drug trafficking in 1987; and a transcript of plaintiff's deposition testimony.
In ruling on defendants' motion, Judge Fernandez-Vina incorporated his prior determinations as to plaintiff's status as a limited-purpose public figure and the applicability of the actual-malice standard. He granted summary judgment in favor of Hornblum, the booksellers and the publishers as to all statements made in Confessions, finding that there was no actual malice proven as to any of them. The judge did note that although plaintiff raised questions of fact concerning Hornblum's character, these were "corollary issues" that could not reasonably establish actual malice by clear and convincing evidence. This appeal followed.
On appeal, plaintiff asserts that the judge erred by concluding that he was a limited-purpose public figure; by finding that Hornblum and his distributor were afforded the same protection as that afforded the traditional news media; by applying the actual malice standard to defendants' motion; and by concluding that plaintiff had failed to create a genuine issue of material fact. We address the issues seriatim.
In his attack on the finding that he was a limited-purpose public figure, plaintiff challenges neither his status as a limited-purpose public figure nor the standard of actual malice but argues that the precedent creating plaintiff's status is misguided. He also challenges the applicability of the actual malice standard to defendants in this case.
The thrust, however, of plaintiff's argument is that the statements about him in Confessions are false, and the book was written, published and distributed with the knowledge that the material was false. In support of these assertions, plaintiff sets forth several examples of Hornblum's alleged lies and poor conduct. Further, he challenges the accuracy of Hornblum's sources by showing that they are inconsistent with plaintiff's own certifications.
The flaws in plaintiff's arguments stem from his misperception of the law of defamation and a focus on facts that are irrelevant to a finding of actual malice.
Plaintiff correctly recognizes that under New Jersey defamation law, he is a limited-purpose public figure. We conclusively settled this issue in Berkery I, supra, 397 N.J.Super. at 225, 936 A.2d 1010, a defamation action brought by plaintiff against a journalist, who wrote two articles about plaintiff's attempts to stop Hornblum from publishing Confessions, and the Philadelphia Inquirer, which, in fact, published the articles.
In Berkery I, after reviewing the relevant legal principles, we noted that "recovery for defamation is limited by the First Amendment requirement that public officials or public figures prove actual malice to recover damages." Id. at 227, 936 A.2d 1010 (citing New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). We further observed that an individual may become a limited-purpose public figure for First Amendment purposes if *1207 he "`voluntarily injects himself or is drawn into a particular public controversy.'" Id. at 227, 936 A.2d 1010 (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789, 812 (1974)).
We recognized that although "[a]n individual who engages in criminal conduct does not automatically become a public figure[,]" "[a]n individual's involvement in publicized criminal activities and associations with organized criminal groups qualifies as a public controversy or issue that gives rise to limited-purpose public figure status." Id. at 227-28, 936 A.2d 1010 (citing Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1086 (3d Cir.), cert. denied, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985)). Considering that "plaintiff acknowledged six criminal convictions, including larceny, passing bogus traveler's checks, attempted burglary of an unoccupied warehouse, assault and battery, and two drug offenses[,]" and that plaintiff's criminal involvement was reflected in public records, we held that "plaintiff clearly qualifies as a limited-purpose public figure who must prove actual malice to recover in a defamation action." Id. at 226, 230, 936 A.2d 1010. We also observed that "[e]ven if he were not a limited-purpose public figure, he is still required to prove actual malice with respect to alleged defamatory statements relating to matters of legitimate public interest." Ibid. (citing LoBiondo v. Schwartz, 323 N.J.Super. 391, 409, 733 A.2d 516 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1211 (1999)). See also Senna v. Florimont, 196 N.J. 469, 485-90, 958 A.2d 427 (2008) (discussing New Jersey's application of the actual-malice standard in private-figure defamation cases in which the challenged speech touches on matters of public concern).
We see nothing in this record that suggests that anything has changed factually that would cause us to modify or depart from our prior conclusions. Our reasoning in Berkery I applies with equal force here, and we conclude that the motion judge did not err in finding that plaintiff was a limited-purpose public figure.
Plaintiff goes on to argue that none of defendants qualify under New Jersey law as "media defendants." He asserts that extending media protection to Hornblum, who has no affiliation with the professional media, is a disservice to bona fide journalists.
In pressing these arguments, plaintiff misconstrues the law and the meaning of the cases that he cites. To support his claim that the actual-malice standard should not be applied to non-media defendants, plaintiff relies on three cases: Trump v. O'Brien, 403 N.J.Super. 281, 958 A.2d 85 (App.Div.2008); In re Madden, 151 F.3d 125 (3d Cir.1998); and von Bulow v. von Bulow, 811 F.2d 136 (2d Cir.1987). None of these cases addresses the applicability of the actual-malice standard. Rather, they involve a defendant's right to invoke the "journalist's privilege" to protect source material from discovery in a defamation action.
In Trump, for example, we considered the New Jersey "newsperson's privilege," N.J.S.A. 2A:84A-21, and the New York Shield Law, N.Y. Civ. Rights § 79-h, in determining that an author, who obtained information for his book from private informants, was a professional journalist entitled to protect his confidential sources. 403 N.J.Super. at 290, 293-94, 958 A.2d 85. While, as plaintiff notes, the judge did acknowledge that there was little precedent on the issue of what constitutes "news," id. at 304, 958 A.2d 85, that comment was made solely with regard to the interpretation of the newsperson's privilege. The judge made no ruling as to the *1208 standard of proof that applied to the plaintiff's defamation claim.
In Madden, supra, 151 F.3d at 126-27, the court considered whether a sports commentator could invoke the journalist's privilege to protect his confidential sources. Likewise, in von Bulow, supra, 811 F.2d at 138, the court considered whether an author could use the journalist's privilege to shield certain investigative reports from discovery. Both of these cases addressed the question of who qualifies to assert a journalist's privilege; neither involved a dispute as to the standard of proof in a defamation claim against a non-media defendant.
Here, there is no claim of newsperson's privilege. Hornblum responded to plaintiff's discovery requests by providing the names of his informants and producing the documents that he used as sources. Trump, Madden and Von Bulow are irrelevant to the issues here.
The issue of the application of the actual malice standard to media and non-media defendants has been addressed in our courts. In Dairy Stores, Inc. v. Sentinel Publishing Company, Inc., 104 N.J. 125, 152-53, 516 A.2d 220 (1986), the New Jersey Supreme Court held that the actual-malice test applies to both non-media as well as media defendants. The Court noted that the United States Supreme Court, a majority of the federal courts and various state courts have similarly concluded that the actual-malice standard applies both to newspapers and private citizens alike. Id. at 152, 516 A.2d 220.
While Dairy Stores was limited by the Court's recent decision in Senna v. Florimont, supra, which characterized the holding in Dairy Stores as extending the actual-malice standard to defendants who were "so closely related to news gathering that they should be treated like media defendants[,]" the Court's reference to Dairy Stores arose in the context of a general discussion of cases that have applied the actual-malice standard to investigative news stories. 196 N.J. at 485, 486-487, 958 A.2d 427. The Court did not address Dairy Stores's more general conclusion that the actual-malice standard can apply to non-media defendants. Moreover, the Court clearly stated, without qualification, that "[t]he actual-malice standard will apply when the alleged defamatory statement concerns a public figure or a public official or involves a matter of public concern." Id. at 496, 958 A.2d 427 (emphasis added). We deem Hornblum to fall within the spectrum of those protected by Dairy Stores. The investigative function an author performs is not substantively different from an investigative journalist. The dispositive element is not the form of the investigative process. In an era marked by a diminution of the classic newsmedia and the print investigative journalist and the proliferation of investigative reporting in media such as cable television, documentary journalismboth televisions and moviesinternet reporting and blogging, the need for protection remains the same. Whether Hornblum was writing a book, news article, a screenplay or a blog, the substance of his body of work remains the same.
As the Senna Court recognized, New Jersey courts have routinely applied the actual-malice standard to non-media defendants when the controversy involved either a public figure or a matter of public concern. See, e.g., DeAngelis v. Hill, 180 N.J. 1, 8-15, 847 A.2d 1261 (2004) (applying the actual-malice standard to a "newsletter" written and distributed by a private citizen); Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 163-65, 735 A.2d 1129 (1999) (applying the actual-malice standard to political campaign materials published by private advocacy groups). Here, plaintiff is a limited-purpose public figure, and his criminal involvement is a matter of public concern. *1209 We conclude that authors, such as Hornblum, are protected by the actual-malice standard, especially when applied to limited-purpose public figures. Judge Fernandez-Vina did not err by applying that actual-malice standard.
Plaintiff further claims that in granting defendants' motion, the court misapplied the summary judgment standard. His argument focuses primarily on the proper analysis for determining whether a statement is defamatory as a matter of law. He also contends that summary judgment is disfavored in a defamation action because inquiry into a defendant's state of mind presents a question of fact that is more appropriate for the jury than for the court.
Neither party challenges the assumption that "statements alleging that the subject committed a crime are defamatory per se." DeVries v. McNeil Consumer Prods., 250 N.J.Super. 159, 166, 593 A.2d 819 (App. Div.1991). For purposes of summary judgment, the statements relating plaintiff's criminal conduct fall within this rule. However, plaintiff's argument requires us to address the application of the actual-malice standard.
We briefly review the relevant case law. False statements about a public figure are not actionable unless published with actual malice. Lynch, supra, 161 N.J. at 165, 735 A.2d 1129. In order to meet the actual-malice standard, "a public figure must prove with convincing clarity that the defamatory statements were published by the defendant with knowledge of their falsity or reckless disregard of whether they were true or false." Lawrence v. Bauer Publ'g & Printing Ltd., 89 N.J. 451, 466, 446 A.2d 469 (citing New York Times Co. v. Sullivan, supra, 376 U.S. at 279-80, 84 S.Ct. at 725-26, 11 L.Ed.2d at 706), cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982). In this context, "reckless disregard" refers to "the publishing of defamatory statements with a `high degree of awareness of their probable falsity.'" Ibid. (quoting Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125, 133 (1964)). In fact, "the recklessness in publishing material of obviously doubtful veracity must approach the level of publishing a `knowing, calculated falsehood.'" Ibid. (quoting Ryan v. Brooks, 634 F.2d 726, 733 (4th Cir.1980)). "Negligent publishing does not satisfy the actual-malice test." Lynch, supra, 161 N.J. at 165, 735 A.2d 1129.
The propriety of resolving an actual-malice defamation action through summary judgment is subject to two important, yet competing, considerations. First, courts have recognized that the perpetuation of meritless actions, with their attendant costs, chills the exercise of free speech about public affairs. Maressa v. N.J. Monthly, 89 N.J. 176, 196, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982). "To avoid this, trial courts should not hesitate to use summary judgment procedures where appropriate to bring such actions to a speedy end." Ibid.; see also Dairy Stores, supra, 104 N.J. at 157, 516 A.2d 220 (noting that "summary judgment practice is particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern"). On the other hand, the actual-malice standard entails a subjective analysis of the defendant's state of mind. DeAngelis, supra, 180 N.J. at 13, 847 A.2d 1261. Courts have cautioned that the issue of a defendant's state of mind in a defamation action "`does not readily lend itself to summary disposition.'" Maressa, supra, 89 N.J. at 197 n. 10, 445 A.2d 376 (quoting Hutchinson v. Proxmire, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411, 422 n. 9 (1979)). On balance, then, "[c]ourts should carefully examine the circumstances *1210 surrounding publication of defamatory allegations of fact to determine whether the issue of actual malice should go to the jury." Ibid.
"To determine whether a genuine issue of material fact exists regarding actual malice, a court must consider whether the plaintiff has produced the `quantum and quality of proof' necessary under the New York Times v. Sullivan standard." Costello v. Ocean County Observer, 136 N.J. 594, 614, 643 A.2d 1012 (1994) (quoting Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1089 (3d Cir. 1988)). "When a case concerns a public official or public figure, the court should grant summary judgment dismissing the complaint if a reasonable jury could not find that the plaintiff had established actual malice by clear and convincing evidence." Lynch, supra, 161 N.J. at 169, 735 A.2d 1129. "Although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the `clear and convincing' standard in defamation action[s] adds an additional weight to the plaintiffs' usual `preponderance of the evidence' burden." Costello, supra, 136 N.J. at 615, 643 A.2d 1012. "Plaintiffs... must produce substantial evidence to survive a motion for summary judgment." Ibid.
Here, the judge applied the appropriate standard. However, that does not end the inquiry, as the proofs presented by plaintiff in response to the motion require consideration of the application of such proofs to the standard on a motion for summary judgment.
Plaintiff argues that he presented a clear and convincing case of defendants' actual malice. He misconstrues the burden of proof, however, when he asserts that Hornblum failed to provide a defense or otherwise substantiate the statements made in Confessions. He contends that because defendants could not prove that the sources Hornblum relied upon were reliable and accurate, plaintiff should prevail as a matter of law.
In support of his argument, plaintiff asserts several examples of Hornblum's alleged untruthfulness and immorality. These allegations include the following: Hornblum lied when he stated he first met plaintiff in April or May 2001, because a "mountain of evidence" shows that the two met in 1998; Hornblum lied about when he first became aware that plaintiff had his robbery conviction expunged, had his drug conviction reversed and had earned several academic degrees; Hornblum lied when he said he was a meticulous researcher, and that no one helped him with his research; Hornblum "besmirched" his own character by admitting to having had sexual relations with several female students; Hornblum lied at deposition when he insisted that plaintiff had been arrested for burglary in 1959, 1964 and 1966, despite plaintiff's proof that the 1959 arrest was for attempted burglary, and that plaintiff was in prison in 1964 and 1966; Hornblum lied in his responses to interrogatories by claiming to have met with three individuals regularly in early 2006 to discuss plaintiff's allegations; Hornblum lied about meeting Philadelphia District Attorney Lynne Abraham in a Chinese restaurant in 2006; Hornblum demonstrated that he was "never short on gall" by suing the Press for legal fees incurred in the present litigation despite the fact that he did not warn the Press about plaintiff's threatened lawsuit; Hornblum could not prove the veracity of an incident reported in the book concerning the suicide of an individual involved in Louis Kripplebauer's scheme to ship cocaine from Florida to Pennsylvania; Hornblum failed to produce documents to support his claim that plaintiff was a regular at the Shamrock Bar in the late 1950s; and Hornblum failed to support his claim that plaintiff was a K & A Gang "crew chief" with any evidence except "false and *1211 defamatory" newspaper articles and reports by the Pennsylvania Crime Commission.
The trial judge correctly concluded that plaintiff's allegations against Hornblum involve "corollary issues" that cannot establish actual malice. Even if plaintiff's allegations are true, none "prove[s] with convincing clarity" that Hornblum published his statements about plaintiff "with knowledge of their falsity or reckless disregard of whether they were true or false." Lawrence, supra, 89 N.J. at 466, 446 A.2d 469.
Because plaintiff had the burden of proof, Hornblum was not required to produce documentation to definitively prove the veracity of his informants or the accuracy of newspaper articles and official state reports. Hornblum's failure to produce such materials cannot be construed to prove that he knew this information to be false. Moreover, the anecdote concerning Kripplebauer did not involve plaintiff and is irrelevant to plaintiff's claim of defamation.
Some of the allegations involve incidents that occurred after Confessions was written. Even if Hornblum's statements concerning his 2006 meetings with informants and his chance encounter with Abraham were intentional lies, they have no connection with the information contained in his book. Likewise, his failure to warn his publisher of plaintiff's threats is unrelated to Hornblum's knowledge of the falsity of his statements. With regard to the dates of plaintiff's burglary convictions, Hornblum's claim that plaintiff was arrested in 1959, 1964 and 1966, was made only in response to interrogatories, not in his book. Even if Hornblum was wrong as to these dates[2], such a mistake does not amount to defamation. Likewise, Hornblum's sexual relationships with students and younger women are irrelevant to his knowledge concerning the truthfulness of the material in his book as is his subjective opinion of his own research skills. Even if he lied about whether he received assistance with his research, such a lie does not establish knowledge of the research's falsity.
Finally, Hornblum's "lies" about when he first met plaintiff and when he first learned of certain personal information about plaintiff are also irrelevant. The fact that Hornblum may be mistaken about the date of his meeting with plaintiff cannot be construed to mean that the information reported in his book is knowingly false. Likewise, the fact that Hornblum denied knowing of changes in plaintiff's criminal record and educational status does not implicate the integrity of his research. Hornblum was under no obligation to include favorable information concerning plaintiff in his book. Moreover, Hornblum's explanation that he knew of plaintiff's claims about his improved circumstances but did not give them any credibility is plausible.
At best, plaintiff's allegations concerning Hornblum show that at times Hornblum was confused as to dates, and that he was not always forthcoming in matters unrelated to the facts set forth in his book. Such a showing falls far short of the clear and convincing evidence needed to establish actual malice.
Although plaintiff claims that proof of a defendant's dishonesty can be considered by a jury in a defamation case, he presents little support for that argument. Plaintiff cites Newton v. Nat'l Broadcasting Co., 930 F.2d 662, 671 (9th Cir.1990), cert. denied, *1212 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991), for the proposition that "constitutional malice may be predicated on the fact-finder's negative assessment of the speaker's credibility at trial," but the case actually stands for the opposite. In the course of reviewing a jury award in a defamation action, the Newton court stated:
[A] determination of actual malice cannot be predicated on the factfinder's negative assessment of the speaker's credibility at trial. Although discredited testimony "does not rebut any inference of actual malice that the record supports,... it is equally clear that it does not constitute clear and convincing evidence of actual malice."
[Ibid. (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502, 524 (1984)).]
Under the rule set forth in Newton, even if a jury were to believe plaintiff's allegations and find that Hornblum is not credible, such a conclusion would not support a finding of actual malice.
Plaintiff's reliance on Tucker v. Fischbein, 237 F.3d 275 (3d Cir.), cert. denied, 534 U.S. 815, 122 S.Ct. 42, 151 L.Ed.2d 15 (2001), is likewise unavailing. In Tucker, the defendant told a reporter that the plaintiff had filed a lawsuit asserting damages for injury to her sex life. Id. at 284. The court found no actual malice in this first statement, because the plaintiff had filed a claim for loss of consortium, and loss of consortium may concern damage to sexual relations. Ibid. However, after the defendant received an amended complaint from the plaintiff, which asserted that his first statement was false, he nevertheless proceeded to make a second statement to the press, again claiming that the plaintiff was attempting to recover for damage to her sexual relationship. Ibid. The court found that this second statement could constitute clear and convincing evidence of actual malice. Id. at 284-85.
Tucker is distinguishable. Here, defendant threatened Hornblum with a lawsuit but only in the most general terms; he did not identify the information that he believed to be false. Hornblum was not served with plaintiff's complaint specifying the allegedly defamatory statements until after the book was published. At that point, even if the complaint did imbue Hornblum with knowledge of the falsity of the statements, it did not change the fact he originally wrote the book without that knowledge. Moreover, most of plaintiff's assertions of truth were based on his own, unsubstantiated claims. As such, they lacked the objective reliability of Tucker's complaint. In other words, whether Tucker sought recovery for damage to her sex life was ascertainable from the plain language of the amended complaint. Whether the facts contained in Confessions were false was not obvious from the face of plaintiff's certifications.
We reject plaintiff's claim that his assertions against Hornblum present clear and convincing proof of actual malice. The motion judge here properly considered plaintiff's failure to make a prima facie showing of actual malice in rendering his decision. The judge also reviewed evidence submitted by defendants, which demonstrated that Hornblum had no reason to believe that his information concerning plaintiff was false.
With regard to plaintiff's alleged involvement in the attempted murder of Robert Poulson, defendants produced notes of Hornblum's interviews of Herbert Rhodes, a Philadelphia police officer who investigated the Poulson matter. According to those notes and an audio tape of an October 20, 2001 interview, Rhodes stated that Poulson told him at the hospital that plaintiff was the person who shot and *1213 stabbed him. Newspaper articles published at the time of the attack stated that police had found blood stains on the rear seat of plaintiff's car. Defendants concede that plaintiff was never actually charged with the attempted murder of Poulson but was only held as a material witness. Nevertheless, they claim that Hornblum's statement, that the police "couldn't make the charges stick and released him[,]" was substantially true, even if carelessly presented. This claim is supported by a newspaper article stating that plaintiff's bail was returned to him "for failure of prosecution to prove Berkery's connection with attack."
Concerning plaintiff's alleged arrest for the murder of Vincent Blaney, defendants assert that this fact is unquestionably true. Their assertion is well supported by a newspaper article from October 19, 1961, which described a "mystery witness" who implicated plaintiff in Blaney's murder. The article also stated that plaintiff surrendered to police investigators.
Defendants deny that Confessions names plaintiff as the most likely candidate for murderer of Richard Blaney. This denial is well-founded, since the passage from the book that is cited by plaintiff merely states that the police interrogated several dozen suspects, but the most likely candidates had "airtight" alibis. Confessions did not name plaintiff as one of the suspects.
With regard to plaintiff's involvement with the Pottsville burglary, plaintiff himself admits that he was convicted of that crime. Further, Confessions specifically states that plaintiff had the conviction overturned, and that he was not re-tried. The book's assertion that the charges were dropped because the legal establishment "had had enough" is clearly an opinion of the author on a matter of public interest and thus not subject to a defamation claim. See Kotlikoff v. Comty. News, 89 N.J. 62, 70, 444 A.2d 1086 (1982) (distinguishing between defamatory statements of fact and protected statements of opinion); Lutz v. Royal Ins. Co. of Am., 245 N.J.Super. 480, 494, 586 A.2d 278 (App.Div.1991) (noting that mere expression of opinion as to a matter of public concern cannot be defamatory).
The evidence submitted by defendants concerning plaintiff's involvement with the K & A Gang is extensive. He is named in A Decade of Organized Crime, 1980 Report Pennsylvania Crime Commission (1980 Report) as a member of the original gang and as the gang's "leader." In fact, the report even includes a photograph of plaintiff under the heading "The K & A Gang." In addition, numerous newspaper articles quote law enforcement officials who refer to plaintiff's involvement in the K & A Gang.
We need not explore in detail the numerous publications depicting plaintiff's involvement in criminal activity. Suffice it to say, they are extensive. See e.g. George Anastasia, Blood and Honor: Inside the Scarfo Mob The Mafia's Most Violent Family 111-12 (1991); Ron Avery, City of Brotherly Mayhem Philadelphia Crimes & Criminals 105 (1997); Sean Patrick Griffin, Black Brothers, Inc. The Violent Rise and Fall of Philadelphia's Black Mafia 289 (2005).
As to the allegedly defamatory material concerning plaintiff's conviction for methamphetamine trafficking, all of plaintiff's claims stem from the same paragraph of Confessions:
John Berkery, considered one of "Philadelphia's most clever and fascinating criminals" by police and crime reporters[,] was another of the many K & A burglars who gravitated to drugs. Berkery was convicted of "distributing 24 pounds of methamphetamine and possession of more than 200 gallons of P-2-P, *1214 the contraband chemical used to make the drug in 1987." This came after he had been a federal fugitive for over five years, much of which he may have spent in Ireland. Commenting on Berkery at his sentencing, federal prosecutor Louis R. Pichini said, "The defendant's unlawful activities exhibit a cunning[,] cleverness and sophistication that has little equal in the Philadelphia criminal community." Now back on the street, Berkery is studying law.
Plaintiff claims that this passage is defamatory because Hornblum fails to mention that plaintiff had his federal conviction reversed. However, Hornblum's including more details about the reversal of plaintiff's conviction would hardly have been exculpatory, since plaintiff subsequently pled guilty to conspiracy to distribute and possession with intent to distribute P-2-P and possession and distribution of methamphetamine P-2-P. Plaintiff also objects to the quotation from Pichini, although the record shows that this is exactly what the federal prosecutor said in his sentencing memorandum. Earlier in the same memorandum, Pichini stated that plaintiff was "particularly dangerous for he combines intelligence and street-smarts with a reputation for `muscle,' and violence that is disguised by an extroverted, disarming personality." Hornblum's quotation from this public document is protected by the fair-report privilege. See Costello, supra, 136 N.J. at 607-09, 643 A.2d 1012 (stating that the purpose of the fair-report privilege is to assure that people who report on official releases, including documents from judicial proceedings, will not be held responsible for the content of the releases). Finally, the comment that plaintiff was "back on the street"meaning that he was out of prisonsimply stated a true fact.
The materials submitted by defendants demonstrate that Hornblum relied on substantial, credible sources in gathering information. To the extent that any of the statements about plaintiff published in Confessions were false, nothing in Hornblum's sources would have caused him to suspect as much.
Plaintiff failed to present clear and convincing evidence from which a jury could have found that Hornblum acted with actual malice in publishing Confessions. The grant of summary judgment was proper.
Affirmed.
NOTES
[1] According to plaintiff, the meeting occurred in 1998 and involved another book authored by Hornblum, Acres of Skin.
[2] Plaintiff's criminal history report does in fact list a conviction for burglary in 1959. He is correct that no burglary convictions are reported in 1964 or 1966, and that Hornblum is apparently mistaken about these dates.