[760 NYS2d 133]

LINDA BEMENT, Respondent-Appellant, v N.Y.P. HOLDINGS, INC., Doing Business as NEW YORK POST, Appellant-Respondent.

First Department, May 13, 2003

## APPEARANCES OF COUNSEL

*Peter Jakab* of counsel *(Peter Neufeld* and *Jonathan A. Willens* on the brief; *Fein & Jakab* and *Cochran Neufeld & Scheck LLP,* attorneys), for respondent-appellant.

*Slade R. Metcalf* of counsel *(Trina R. Hunn* on the brief; *Hogan & Hartson L.L.P.*, attorneys), for appellant-respondent.

## OPINION OF THE COURT

WILLIAMS, J.

This action arose as the result of an article titled " '60s

Queen: I Was a Sexy Spy During Cold War," published by defendant New York Post (the Post) in its May 13, 1998 issue, and written by Post reporter Michael Shain. The article reported that an unpublished magazine article (the treatment) by veteran journalist Laurence Gonzales was being circulated among Hollywood movie studios. The treatment, which referred to its subject by the pseudonym "Anita Follett," was reported to be based on the life of plaintiff Linda Bement, the 1960 Miss Universe and a high profile personality of that era, who, it alleged, served as a spy for the United States Central Intelligence Agency (the CIA). Among other things, the Post article stated that:

> "Linda Bement—was more than just a world-trotting, empty-headed beauty queen. She was a spy for the CIA, she now claims;

> "Bement claims that * * * she slept with foreign government officials in order to plant electronic eaves-dropping devices in their offices and private homes;

> "her rhinestone crown and Miss Universe sash—and her access to high-ranking foreign officials—were the perfect cover for an American spy;

> "* * * Linda Bement admits her role as the beauty-queen spy of the '60s;

> "* * * Bement claims it was her job to use her beauty and her position to get close to foreign officials—especially in Latin America;

> "Bement claims she was able to fend off most of the advances from officials—but several times was 'raped' by the men she was sent to spy on.

> "Meanwhile, for the press and her family, she played dumb."

The Post article went on to report that Gonzales planned to offer the story to Vanity Fair magazine and that "[h]is agents have been showing [it] to Hollywood producers this week in hopes of selling movie rights first." A 1960s photograph of plaintiff wearing a bathing suit and gazing at a poster of Warren Beatty appears right next to the article. The caption states: "MAKE LOVE NOT WARREN: Miss Universe Linda Bement, whose taste in men was not limited to Warren Beatty, thinks her story ought to be in pictures."

The action was commenced in May 1999. The complaint alleged three causes of action, the first sounding in libel, which asserted the defamatory nature of all of the statements noted above, including the article's title, the second alleging the commercial use of plaintiff's name and likeness without her consent and a right to relief, pursuant to Civil Rights Law §§ 50 and 51, respectively, and the third alleging intentional infliction of emotional distress. After discovery was completed, the Post filed a motion for summary judgment, seeking dismissal of all three causes of action.

The motion court granted in part and denied in part the motion for summary judgment. It dismissed the libel cause of action as to each of the statements on both per se and per quod theories, finding that the article "could not have even arguably led the reader to form an unsavory opinion about [plaintiff]." It also dismissed the third cause of action for intentional infliction of emotional distress, finding that the Post did not act extremely or outrageously by publishing the article. The court declined to dismiss the second cause of action grounded in the Civil Rights Law, finding that although the subject of the article was newsworthy and the Civil Rights Law right of privacy does not generally apply to newsworthy events or matters of public interest and that the article was not a disguised advertisement, a question of fact exists as to whether the so-called "material and substantial falsification" rule and its requirement of constitutional malice might apply here, i.e., that the article "was published with knowledge that it was essentially false or with a reckless disregard for the truth."

Defendant appealed the court's refusal to dismiss the Civil Rights Law cause of action; plaintiff cross-appealed the court's dismissal of the first and third causes of action.

■ The key issue on the main appeal is whether the motion court properly denied defendant summary judgment on the Civil Rights Law cause of action by finding that a triable issue of fact exists as to whether the news article was published with knowledge of its falsity or with reckless disregard for the truth.

Civil Rights Law §§ 50 and 51 provide, respectively, that it is a misdemeanor to use a living person's "name, portrait or picture" for advertising or trade purposes without first obtaining his or her written authorization and that an aggrieved person may maintain an equitable action to prevent such unauthorized use and may also sue to recover damages sustained as a result. The Court of Appeals has limited this statutory

right to privacy by generally making it inapplicable where the use occurs in the context of a report of newsworthy events or matters of public interest, since in such instance the use "is not deemed produced for the purposes of advertising or trade" and also as a matter of deference to the constitutional right to free speech (*Messenger v Gruner + Jahr Print. & Publ.*, 94 NY2d 436, 441 [2000], *conformed to answer of certified question* 208 F3d 122 [2000]). " '[N]ewsworthiness' is to be broadly construed * * * Whether an item is newsworthy depends solely on 'the content of the article'—not the publisher's 'motive to increase circulation.' " (*Messenger*, 94 NY2d at 441-442 [citation omitted]). The newsworthiness doctrine applies "regardless of any false implication that might be reasonably drawn from the use of [plaintiff's name or image]" (*Messenger*, 94 NY2d at 444). However, where either the article is found to be an advertisement in disguise or the use of the plaintiff's identity is found to bear no real relationship to the article, the statutory provisions will apply (*Messenger*, 94 NY2d at 442-443; *Finger v Omni Publs. Intl.*, 77 NY2d 138, 143 [1990]).

Based on these principles, plaintiff's Civil Rights Law § 51 claim should have been dismissed. The article clearly reports newsworthy events; a sensational, purportedly true story linking sex, a leading beauty queen, and espionage during a critical period in recent history is, for better or worse, undoubtedly a matter of public interest. Thus the question becomes whether the article is an advertisement in disguise or whether its use of plaintiff's image and name bears any real relationship to the article. As the motion court correctly found, there is no indication in the record that the Post is connected financially or otherwise to the Miss Universe pageant or that the article was an attempt to promote the pageant. Had the court then proceeded, as it should have, to consider the real relationship issue, in our view, it would have been constrained to find on this record that the use of plaintiff's photo and name bears a real relationship to the article and that the claim had to be dismissed. Despite the alleged factual errors, the subject of the article is plaintiff's purported exploits during her reign as Miss Universe 1960; therefore use of her name and of a contemporaneous photo of her clad in a swimsuit clearly relates to the text of the article.

The motion court erred by inexplicably shifting gears and incorporating material and substantial falsification analysis into its newsworthiness analysis of the issues. The Court of Appeals made it clear in *Messenger*, which reached the Court

on certified questions from the United States Court of Appeals for the Second Circuit, that once it is determined on a Civil Rights Law § 51 claim that the published article is newsworthy, the only query at that point becomes whether the article is an advertisement in disguise or whether its use of plaintiff's name and/or image bears any real relationship to the article. The Court viewed the older material and substantial falsification line of cases, *Binns v Vitagraph Co.* (210 NY 51 [1913]), *Gautier v Pro-Football, Inc.* (304 NY 354 [1952]) and *Spahn v Julian Messner, Inc.* (18 NY2d 324 [1966], *vacated* 387 US 239 [1967], *adhered to on remand and rearg* 21 NY2d 124, 127 [1967]), as addressing works "so infected with fiction, dramatization or embellishment that it cannot be said to fulfill the purpose of the newsworthiness exception" (*Messenger*, 94 NY2d at 446).

Even if we were to accept the motion court's mistaken view that the material and substantial falsification doctrine applies to this matter, however, the result should be dismissal. The motion court found that plaintiff set forth, and the Post failed to controvert, numerous instances of substantial, material falsification in the article, thus reaching the issue of constitutional malice. Since the record demonstrates as a matter of law that the article was not published with knowledge of falsification, the issue then becomes whether, as a matter of law, it was published with a reckless disregard for the truth. In order to prove a reckless disregard for the truth, plaintiff had to show that Shain subjectively doubted the truth of the information received from his confidential source and that he deliberately failed to seek information that might have confirmed the probable falsity of that received from his confidential source (*see Sweeney v Prisoners' Legal Servs. of N.Y.*, 84 NY2d 786, 793 [1995]; *Khan v New York Times Co.*, 269 AD2d 74, 77 [2000]). Although the record contained evidence of Shain's failure to read the treatment beforehand, his minimal efforts to contact plaintiff to verify the treatment's accuracy and her alleged quotes, and his failure to inquire of Gonzales as to the accuracy of the treatment, this was a far cry from clear and convincing proof of a reckless disregard for the truth. Moreover, there was conclusive evidence in the record that demonstrated that Shain reasonably believed the information reported to be true and that he had no evidence before him that would suggest that the information reported was probably false.

■ We concur with the motion court's dismissal of the first and third causes of action. Plaintiff's libel claim was unsup-

ported by the evidence as a matter of law on either a defamation per se or per quod theory. Plaintiff alleged that the article clearly imputes to her unchaste behavior and the commission of a crime, i.e., espionage. However, the motion court correctly held that it is not defamatory where an article wrongly states that a person engaged in espionage on behalf of her government, citing *Phillips v Washington Mag., Inc.* (58 Md App 30, 37, 472 A2d 98, 102 [1984], *cert denied* 300 Md 89, 475 A2d 1201 [1984]) and *Pridonoff v Balokovich* (36 Cal 2d 788, 790, 228 P2d 6, 7 [1951]). It also correctly held that with regard to her alleged unchaste behavior, the article was vague and/or ambiguous in that it made conflicting claims that she "slept" with foreign government officials, but also that she was raped on several occasions and that other times she rejected their advances. It was never stated that she voluntarily engaged in sex with anyone or that this alleged conduct was pleasurable or economically rewarding for her; instead the article conveyed the view that her alleged conduct amounted to a sacrifice for the good of her country. This finding is also consistent with case law (*see e.g. James v Gannett Co.*, 40 NY2d 415, 419-420 [1976]; *Morrow v Wiley*, 73 AD2d 859 [1980]). The court found that the article did not "expose [plaintiff] to hatred, contempt or aversion, or * * * induce an evil or unsavory opinion of [her] in the minds of a substantial number of the community" (*Golub v Enquirer/Star Group*, 89 NY2d 1074, 1076 [1997], quoting *Mencher v Chesley*, 297 NY 94, 100 [1947]).

■ Similarly, the record evidence fails as a matter of law to support a claim of intentional infliction of emotional distress. To substantiate such a claim, a plaintiff need prove that defendant engaged in extreme and outrageous conduct of a character and degree as to exceed the bounds of decency such that it would be utterly intolerable in a civilized society (*Howell v New York Post Co.*, 81 NY2d 115, 121 [1993]; *Freihofer v Hearst Corp.*, 65 NY2d 135, 143 [1985]; *Rall v Hellman*, 284 AD2d 113, 115 [2001]). Plaintiff failed to prove that the allegations placed her in personal danger and it is long settled that publication of a single, purportedly false or defamatory article regarding a person does not constitute extreme and outrageous conduct as a matter of law (*Levin v McPhee*, 917 F Supp 230, 242-243 [1996], *affd* 119 F3d 189 [1997]). Moreover, as previously noted, she failed to prove constitutional malice.

Accordingly, the order of the Supreme Court, New York County (Marylin Diamond, J.), entered on or about June 12, 2002, which granted defendant's motion for summary judg-

ment to the extent of dismissing plaintiff's first and third causes of action, sounding in libel and intentional infliction of emotional distress, respectively, but denied summary judgment as to plaintiff's second cause of action, for relief pursuant to Civil Rights Law § 51, should be modified, on the law, to the further extent of granting summary judgment dismissing the second cause of action, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.

NARDELLI, J.P., ELLERIN and LERNER, JJ., concur.

Order, Supreme Court, New York County entered on or about June 12, 2002, modified, on the law, to the further extent of granting summary judgment dismissing the second cause of action, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendant dismissing the complaint.