29 A.3d 1090 (2011)
422 N.J. Super. 540
Donald J. TRUMP, Plaintiff-Appellant,
v.
Timothy L. O'BRIEN, Time Warner Book Group, Inc., and Warner Books, Inc., Defendants-Respondents.
No. A-6141-08T3
Superior Court of New Jersey, Appellate Division.
Argued April 12, 2011.
Decided September 7, 2011.
*1091 Karen A. Confoy argued the cause for appellant (Sterns & Weinroth attorneys; Joel H. Sterns, of counsel; Ms. Confoy and Erica S. Helms, Trenton, on the brief).
Andrew J. Ceresney (Debevoise & Plimpton L.L.P.) of the New York bar, admitted pro hac vice, argued the cause for respondents (Reed Smith L.L.P. and Mr. Ceresney, attorneys; Mr. Ceresney, Mary Jo White (Debevoise & Plimpton L.L.P.) of the New York bar, admitted pro hac vice, and Andrew M. Levine (Debevoise & Plimpton L.L.P.) of the New York bar, admitted pro hac vice, of counsel; Kellie A. Lavery and Mark S. Melodia, Princeton, on the brief).
Before Judges PAYNE, KOBLITZ and HAYDEN.
The opinion of the court was delivered by
*1092 PAYNE, J.A.D.
Donald Trump, the plaintiff in a suit for defamation, appeals from a Law Division order granting summary judgment to defendants, Timothy O'Brien, the author of TrumpNation, The Art of Being The Donald, and his publishers, Time Warner Book Group, Inc. and Warner Books, Inc.[1] On appeal, Trump contends that he produced clear and convincing evidence of actual malice on the part of O'Brien and that issues of fact precluded summary judgment. He argues as well that O'Brien was an agent of his publisher, and thus the publisher defendants should be held liable on a theory of respondeat superior. We affirm.

I.
O'Brien is a financial reporter with graduate degrees from Columbia University in journalism, business and United States history. He has reported on business and other subjects for newspapers including The New York Times and The Wall Street Journal, and he presently serves as the editor of the Sunday Business section of The Times. Over the years, O'Brien has written extensively on Trump. In 1992, he served as a research assistant to Wayne Barrett, the author of a Trump biography entitled Trump: The Deals and The Downfall. In 1998, O'Brien wrote Bad Bet: The Inside Story of the Glamour, Glitz, and Danger of America's Gambling Industry, a book that included reporting on Trump's Atlantic City casino operations. In 2004, O'Brien participated in writing a series of articles about Trump that appeared in The Times that focused on financial troubles faced by Trump's enterprises and the difficulty of determining an accurate value for Trump's holdings and his net worth. In one article, co-authored by O'Brien, that appeared on September 8, 2004, he reported Trump's estimates of his own net worth as between $2 billion and $5 billion. However, O'Brien also wrote:
The largest portion of Mr. Trump's fortune, according to three people who had had direct knowledge of his holdings, apparently comes from his lucrative inheritance. These people estimated that Mr. Trump's wealth, presuming that it is not encumbered by heavy debt, may amount to about $200 million to $300 million. That is an enviably large sum of money by most people's standards but far short of the billionaire's club.
In December 2004, O'Brien signed a contract with Warner Books, Inc. to write TrumpNation. Despite negative reporting in the past, Trump cooperated with O'Brien in connection with that book, submitting to interviews on numerous occasions, making available members of his staff including Chief Financial Officer Allen Weisselberg and in-house attorney Michelle Lokey, and disclosing certain financial information and supporting documents. In writing his book, O'Brien reported on information conveyed by Trump, but he also utilized the research he had gathered in connection with his prior writings about Trump, new research, and re-interviews of the three anonymous sources used earlier who, now, "lowered their estimates of Trump's net worth to between $150 million and $250 million (because of the decreased value of Trump's casino holdings at the time [he] was writing the Book)."
On October 23, 2005, The Times published in the newspaper an excerpt from Chapter Six of TrumpNation that contained *1093 the lowered estimates provided by the three anonymous sources as to Trump's net worth, but also included a statement that "Donald's casino holdings have recently rebounded in value, perhaps adding as much as $135 million to these estimates." Three days later, on October 26, 2005, the book was published without the added statement.
In Chapter Six, O'Brien discussed at length Trump's vacillating fortunes and the difficulty he experienced in attempting to determine with any accuracy what Trump's net worth actually was. O'Brien commenced the chapter with a description of the first phase of Trump's careerone that ended with admitted debts of $900 millionand the deals he made with banks to restructure those debts. He then turned to a description of Trump's appearance on, disappearance from, and reappearance on Forbes magazine's annual list of America's 400 wealthiest individuals, noting Trump's jockeying for inclusion on that list, and stating that in 2004 Trump ranked 189th with an estimated wealth of $2.6 billion. O'Brien then turned to a conversation that he had with Trump in early 2005, during which Trump had stated that he was worth $5 to $6 billion. However, O'Brien noted that, during the prior August, Trump had stated to him that his net worth was $4 to $5 billion, but later that day stated that his casino holdings represented two percent of his wealth, which "gave him a net worth of about $1.7 billion." Additionally, O'Brien noted that a brochure on the nightstand at Trump's Palm Beach club stated that he was worth $9.5 billion.
Referring to an April 21, 2005 meeting with Weisselberg, O'Brien stated that he had been informed at that time that Trump was worth $6 billion, "[b]ut the list of assets Weisselberg quoted, all of which were valued in very inflated and optimistic terms and some of which Donald didn't own, totaled only about $5 billion." Weisselberg, it was stated, was unable to come up with evidence of the additional billion. A chart detailing "Weisselberg's assessment of Donald's riches" that in large measure corresponds to O'Brien's handwritten notes of the April 21 meeting was reproduced on the facing page.
O'Brien wrote that the chart containing Weisselberg's valuations "left me confused." That statement was followed by the passage that gives rise to this lawsuit. There, O'Brien, relying on his three anonymous sources, stated:
So I asked around for guidance. Three people with direct knowledge of Donald's finances, people who had worked closely with him for years, told me that they thought his net worth was somewhere between $150 million and $250 million. By anyone's standards this still qualified Donald as comfortably wealthy, but none of these people thought he was remotely close to being a billionaire.[2]
That passage was followed by:
Donald dismissed this as naysaying.

*1094 "You can go ahead and speak to guys who have four-hundred-pound wives at home who are jealous of me, but the guys who really know me know I'm a great builder," he told me.
Additionally, in Chapter Six, O'Brien discussed Trump's interest in Manhattan property known as the West Side Yards. He noted that Trump had initially purchased the property for $115 million, but had been forced to sell it to a Hong Kong development group in 1994 for $85 million. He wrote: "According to former members of the Trump Organization, Donald didn't retain any ownership of the sitethe Hong Kong group merely promised to give him a 20 to 30 percent cut of the profits once the site was completely developed." He stated further:
In June 2005, the Asian investors who controlled the West Side Yards sold the entire site for $1.8 billionabout half the amount that Donald had told me it was worth. Although Donald told me that the site was debt free when the Asians sold it, others involved in the transaction said the Yards carried a substantial amount of debt and expenses that had to be deducted from the sale price. Although Donald declined to detail how much money he realized personally on the sale, it was certainly a fraction of the $1.3 billion he had told me that the Yards would add to his bank account after a sale.
Following publication of TrumpNation, suit was filed on Trump's behalf.
During the course of discovery, Trump sought disclosure of the identity of the three confidential sources utilized by O'Brien, his notes regarding his interviews with those sources, and various other non-confidential materials relating to O'Brien's research, writing and editorial processes. O'Brien resisted disclosure of this information, but following Trump's motion to compel production, the motion judge (a judge different from the one granting summary judgment) ordered that the information and documents be produced. Defendants then sought leave to appeal. We granted the motion and reversed the motion judge's order, finding that the confidential materials were absolutely protected by New York's Shield Law, N.Y. Civ. Rights § 79-h, and the New Jersey newsperson's privilege, N.J.R.E. 508 and N.J.S.A. 2A:84A-21. Trump v. O'Brien, 403 N.J.Super. 281, 298, 302-04, 958 A.2d 85 (App.Div.2008). We found, additionally, that a qualified privilege, which Trump had failed to overcome, applied under § 79-h(c) of New York's Shield Law to non-confidential materials relating to the research, writing and editorial processes that O'Brien sought to protect, id. at 302, 958 A.2d 85,[3] and that those materials were absolutely protected by New Jersey law. Id. at 302-04, 958 A.2d 85.
Prior to moving for summary judgment, O'Brien produced redacted copies of the notes taken of interviews with the three confidential sources in 2004 and 2005. He has declined to identify those sources, claiming that they would be subject to retaliation were he to do so. On March 20, 2009, defendants filed two motions for summary judgment, arguing in one that Trump had failed to demonstrate by clear and convincing evidence actual malice on the part of O'Brien or respondent *1095 superior liability on the part of the publisher defendants, and in the other arguing that Trump had failed to demonstrate that he had been damaged by O'Brien's allegedly defamatory statements. In a lengthy, thoughtful and legally well-supported oral opinion, Judge Michele M. Fox, relying on New Jersey and New York law, which she properly found to be in accord on the issues raised, granted summary judgment on the ground that Trump had failed to establish actual malice. She did not reach defendants' second motion.

II.
"In order to establish a prima facie case of defamation . . . a plaintiff must show that a defendant communicated to a third person a false statement about the plaintiff that tended to harm the plaintiff's reputation in the eyes of the community or to cause others to avoid plaintiff." McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J.Super. 303, 312, 751 A.2d 1066 (App.Div.) (citing Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 164-65, 735 A.2d 1129 (1999)), certif. denied, 166 N.J. 606, 767 A.2d 484 (2000). Because there is no doubt that Trump is a public figure, to be actionable, the alleged defamatory statements by O'Brien must have been uttered or published with "actual malice." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). To establish actual malice, Trump was required to demonstrate by clear and convincing evidence, id. at 285-86, 84 S.Ct. at 729, 11 L.Ed.2d at 710, that O'Brien published his statements "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." Id. at 279-80, 84 S.Ct. at 726, 11 L.Ed.2d at 706.
We have recently addressed the actual malice standard, stating:
In order to meet the actual-malice standard, "a public figure must prove with convincing clarity that the defamatory statements were published by the defendant with knowledge of their falsity or reckless disregard of whether they were true or false." Lawrence v. Bauer Publ'g & Printing Ltd., 89 N.J. 451, 466 [446 A.2d 469] (citing New York Times Co. v. Sullivan, supra, 376 U.S. at 279-80, 84 S.Ct. at 725-26, 11 L.Ed.2d at 706), cert. denied, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 395 (1982). In this context, "reckless disregard" refers to "the publishing of defamatory statements with a `high degree of awareness of their probable falsity.'" Ibid. (quoting Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125, 133 (1964)). In fact, "the recklessness in publishing material of obviously doubtful veracity must approach the level of publishing a `knowing, calculated falsehood.'" Ibid. (quoting Ryan v. Brooks, 634 F.2d 726, 733 (4th Cir.1980)). "Negligent publishing does not satisfy the actual-malice test." Lynch, supra, 161 N.J. at 165 [735 A.2d 1129].
[Berkery v. Estate of Stuart, 412 N.J.Super. 76, 90, 988 A.2d 1201 (App.Div. 2010).]
A determination of the existence of actual malice requires a subjective inquiry focusing on the defendant's state of mind. DeAngelis v. Hill, 180 N.J. 1, 13, 847 A.2d 1261 (2004). "To find actual malice, the factfinder must determine that the defendant in fact entertained serious doubts about the truth of the statement or that defendant had a subjective awareness of the story's probable falsity." Costello v. Ocean Cnty. Observer, 136 N.J. 594, 615, 643 A.2d 1012 (1994) (citing Schiavone Constr. Co v. Time, Inc., 847 F.2d 1069, 1089 (3d Cir.1988)). As a consequence, although the use of summary judgment *1096 procedures to conclude defamation actions is favored, Maressa v. New Jersey Monthly, 89 N.J. 176, 196, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982), courts have recognized that an analysis of a defendant's state of mind in a defamation action "`does not readily lend itself to summary disposition.'" Id. at 197 n. 10, 445 A.2d 376 (quoting Hutchinson v. Proxmire, 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411, 422 n. 9 (1979)). As a consequence, we are instructed to "carefully examine the circumstances surrounding publication of defamatory allegations of fact to determine whether the issue of actual malice should go to the jury." Ibid.
In this regard, we are also bound by the standard applicable to summary judgment set forth in Brill v. Guardian Life Insurance Company of America, 142 N.J. 520, 540, 666 A.2d 146 (1995) and Rule 4:46-2(c). See Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998). Thus, we can affirm summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Ibid.
"To determine whether a genuine issue of material fact exists regarding actual malice, a court must consider whether the plaintiff has produced the `quantum and quality of proof' necessary under the New York Times v. Sullivan standard." Costello v. Ocean County Observer, 136 N.J. 594, 614 [643 A.2d 1012] (1994) (quoting Schiavone Constr. Co. v. Time, Inc., 847 F.2d 1069, 1089 (3d Cir.1988)). "When a case concerns a public official or public figure, the court should grant summary judgment dismissing the complaint if a reasonable jury could not find that the plaintiff had established actual malice by clear and convincing evidence." Lynch, supra, 161 N.J. at 169 [735 A.2d 1129]. "Although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the `clear and convincing' standard in defamation action[s] adds an additional weight to the plaintiffs' usual `preponderance of the evidence' burden." Costello, supra, 136 N.J. at 615 [643 A.2d 1012]. "Plaintiffs . . . must produce substantial evidence to survive a motion for summary judgment." Ibid.

[Berkery, supra, 412 N.J.Super. at 91-92, 988 A.2d 1201.]

III.
A major focus of the parties' argument centers on O'Brien's anonymous sources. In that regard, Trump argues that the information supplied was false, that O'Brien deliberately disregarded contrary information, and that O'Brien's reliance on his sources demonstrates actual malice. We disagree.
The Supreme Court has held:
A finding of actual malice may not be based solely on the character of the published statement. Washington Post Co. v. Keogh, 365 F.2d [965,] 970 [(D.D.C.1966)]. Nor may it be based solely on the publisher's failure to seek independent verification of the information. St. Amant v. Thompson, 390 U.S. [727], 731, 88 S.Ct. [1323], 1325, 20 L.Ed.2d [262], 267 [(1968)]. The two in combination, however, may support a conclusion of recklessness. Public figure libel plaintiffs can recover for
a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of *1097 highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. [Curtis Publishing Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, [1111], reh. den., 389 U.S. 889, 88 S.Ct. 11, 19 L.Ed.2d 197 (1967) (holding it reckless to allege that respondent football coach "fixed" a game when defendant publication failed to investigate reports that allegation was false)].
Thus, an inference of actual malice may arise when a false report is published solely in reliance on confidential sources if (1) the content of the report is such as to be defamatory as a matter of law, (2) the defendant knew or should have known of some reasonable means of verifying its accuracy, and (3) the failure to verify rises to the level of a gross violation of the standards of responsible journalism. If the recklessness approaches the level of publishing a knowing, calculated falsehood, the decision whether the defendant acted with reckless disregard for the truth should be submitted to the jury. See Lawrence v. Bauer Publishing & Printing, 89 N.J. 451, 466-467 [446 A.2d 469] (1982).
[Maressa, supra, 89 N.J. at 199-200, 445 A.2d 376 (footnote omitted).]
We do not find that standard to have been met in this case. O'Brien has certified that he re-interviewed his three confidential sources prior to publishing their net worth estimates, and he has produced notes of his meetings with them both in 2004 and in 2005. The notes are significant, in that they provide remarkably similar estimates of Trump's net worth, thereby suggesting the accuracy of the information conveyed. See Clyburn v. News World Commc'ns, Inc., 705 F.Supp. 635, 642 (D.D.C.1989) (basing finding of no actual malice on fact that confidential sources gave consistent information).
Further, the accounts of the sources contain significant amounts of additional information that O'Brien was able to verify independently. In answers to interrogatories, he listed that information as:
(1) plaintiff's interest in the limited partnerships that owned the West Side Yards project, (2) plaintiff's negotiations with Hilton in the mid-1990s regarding the potential sale of plaintiff's casino company, (3) plaintiff's business dealings with Kenneth Shapiro and Daniel Sullivan; (4) negotiations regarding the restructuring of Trump Hotels and Casino Resorts, Inc. in 2004; (5) the sale of Fred Trump's real estate portfolio in Brooklyn in 2004; (6) plaintiff's interest in 40 Wall Street and the level of borrowings relating to that property; (7) plaintiff's interest in the CM Building and litigation surrounding that interest; (8) plaintiff's interest in Trump International Hotel and Tower on Columbus Circle in New York; (9) plaintiff's financial condition and the restructuring of plaintiff's outstanding debt during certain periods.
That the source has provided other reliable information is recognized as an indicator of reliability in criminal cases involving informants. See, e.g., State v. Keyes, 184 N.J. 541, 555, 878 A.2d 772 (2005). It has also been recognized as significant in a defamation context to demonstrate the absence of actual malice. Southwell v. S. Poverty Law Ctr., 949 F.Supp. 1303, 1307-08 (W.D.Mich.1996).
In support of their argument that O'Brien's reliance on his confidential sources was proper, defendants cite Sprewell v. NYP Holdings, Inc., 43 A.D.3d 16, 841 N.Y.S.2d 7 (2007). In that case, then New York Knicks player, Latrell Sprewell, *1098 claimed he was libeled by defendant, Marc Berman, a reporter for The New York Post, when he wrote an article, based in part on information provided by confidential sources, stating that Sprewell had broken his shooting hand in September 2002 by hitting a wall on his boat during an altercation but did not promptly report the injury to the team. Berman noted that Sprewell denied that he broke his hand in the manner Berman claimed. Id. at 8-10.
In determining that summary judgment should have been granted by the trial court, even assuming that Berman's statements as to how Sprewell injured his hand were false, the appeals court noted that the information in Berman's articles was not reported as uncontrovertible fact, but rather, the author disclosed that the articles were based on the reports of two confidential informants and that the information was denied by Sprewell. Id. at 10. The court also noted that the record had demonstrated that Berman subjectively believed the information, and that a partial description of the interior of Sprewell's boat provided additional evidence of reliability. Ibid.
Further, Berman had sought to verify the informants' accounts by speaking with plaintiff through his agent and publicist, and seeking confirmation through multiple other sources. Id. at 10-11. The court held: "Those investigative efforts demonstrate that Berman did not deliberately fail to seek confirmatory information or otherwise act with reckless disregard for the truth." Id. at 11. In these circumstances, the court held that plaintiff had not presented any evidence that would raise a triable issue of fact concerning actual malice, let alone the clear and convincing evidence of malice applicable on summary judgment. Ibid. "Indeed, while plaintiff, through his representatives, denied the accusations of the confidential witnesses, his explanation for the injury continuously changed, from he had `no clue,' to he banged it while `frantically pulling on a rope' sailing in rough waters, to he `slipped and fell.'" Ibid. Accordingly, summary judgment should have been granted. See also Bement v. N.Y.P. Holdings, Inc., 307 A.D.2d 86, 760 N.Y.S.2d 133, 137 (2003); Suson v. NYP Holdings, Inc., 19 Misc.3d 1116(A), 862 N.Y.S.2d 818 (N.Y.Civ.Ct. 2008).
Defendants argue that the facts of the present matter are akin to Sprewell and likewise support summary judgment in their favor. We conclude that defendants' position has merit. In this regard, we note that, contrary to Trump's position, O'Brien does not adopt the low estimates of net worth set forth by his anonymous sources. In his deposition, O'Brien testified: "I had good reason to believe [the sources] felt the numbers were accurate, and I had very, very good reason to believe that they were." However, in the book, O'Brien did not cite the sources' views as fact, but instead utilized their lower figures as an illustration of the spread in estimates of Trump's wealth, while suggesting that, in his own view, Trump's net worth was far less than he claimed it to be. O'Brien's opinions in this regard were not actionable, because they were absolutely privileged. Maressa, supra, 89 N.J. at 197, 445 A.2d 376 (citing, inter alia, Gertz v. Robert Welch, Inc., 418 U.S. 323, 339-40, 94 S.Ct. 2997, 3006-07, 41 L.Ed.2d 789, 805 (1974)); see also Kotlikoff v. The Community News, 89 N.J. 62, 73-74, 444 A.2d 1086 (1982).
Further, as in Sprewell, O'Brien reported Trump's denial of the accuracy of the low net worth figures, although his statement, touting his abilities as a builder, can be construed as less of a denial than an avoidance of the issue presented. Even if that denial had been absolute, which it *1099 certainly was not, publication of a statement in the face of denial, however vehement, does not constitute actual malice. Edwards v. Nat'l Audubon Soc, 556 F.2d 113, 121 (2d Cir.) ("such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error."), cert. denied, sub nom. Edwards v. N.Y. Times Co., 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977).
Additionally, as we have previously stated, O'Brien confirmed much of the information provided by the confidential sources, and, like the reporter in Sprewell, he sought to confirm the net worth numbers. In this regard, we note that in claiming that overwhelming evidence established the scale of Trump's wealth, Trump relied in large measure on a 2004 Statement of Financial Condition prepared by Weiser L.L.P., Certified Public Accountants, to which O'Brien was allegedly given access on three occasions including during the course of the April 21, 2005 meeting.
However, a preface to that Statement demonstrates its limited value as an accurate representation of Trump's net worth. There, the accountants cautioned that they had "not audited or reviewed the accompanying statement of financial condition and, accordingly, do not express an opinion or any other form of assurance on it." Further, the accountants noted significant departures from generally accepted accounting principles, and stated "[t]he effects of the departures from generally accepted accounting principles as described above have not been determined." Among the issues they found to exist was the fact that estimates of amounts to be received in the future did not reflect rights that were non-forfeitable, fixed and determinable and not dependent on future services. The values of Trump's closely held businesses were not expressed in terms of assets net of liabilities, and the ownership percentages of each closely held business held by Trump was not disclosed. Additionally, the tax consequences on Trump's holdings were not set forth. As a result, the accountants concluded:
Because the significance and pervasiveness of the matters discussed above make it difficult to assess their impact on the statement of financial condition, users of this financial statement should recognize that they might reach different conclusions about the financial condition of Donald J. Trump if they had access to a revised statement of financial condition prepared in conformity with generally accepted accounting principles.
Gerald Rosenblum, an accountant who participated in compiling the 2004 Statement of Financial Condition, was asked in his deposition whether he was aware of all liabilities of Trump and his related entities. He responded: "I asked the client to provide me with a list of liabilities as they existed at June 30th, 2005. The client presented me with a list, in essence. I'm not certain to this day that I was aware of all of Mr. Trump's liabilities at that point in time, and I sought no corroboration."
While O'Brien may have had "unprecedented" access to evidence of Trump's financial position, nothing in the record suggests that such access was sufficient to permit an accurate estimate of his net worth. Further, it is indisputable that Trump's estimates of his own worth changed substantially over time and thus failed to provide a reliable measure against which the accuracy of the information offered by the three confidential sources could be gauged. The following exchange from Trump's deposition is illustrative of this point:

*1100 Q Now, Mr. Trump, have you always been completely truthful in your public statements about your net worth of properties?
A I try.
Q Have you ever not been truthful?
A My net worth fluctuates, and it goes up and down with markets and with attitudes and with feelings, even my own feelings, but I try.
Q Let me just understand that a little bit. Let's talk about net worth for a second. You said that the net worth goes up and down based upon your own feelings?
A Yes, even my own feelings, as to where the world is, where the world is going, and that can change rapidly from day to day. Then you have a September 11th, and you don't feel so good about yourself and you don't feel so good about the world and you don't feel so good about New York City. Then you have a year later, and the city is as hot as a pistol. Even months after that it was a different feeling.
So yeah, even my own feelings affect my value to myself.
. . . .
Q When you publicly state what you're worth, what do you base that number on?
. . . .
A I would say it's my general attitude at the time that the question may be asked. And as I say, it varies.
Further, as defendants note in their brief, other sources recognized the difficulty of estimating Trump's net worth and the wide spread of plausible values. Defendants quote a September 9, 2004 article in The Washington Post, which stated:
Actually, it's hard to know exactly what percent of Trump's net worth is tied to the casino business, because most of Trump's portfolio is in privately held companies that don't report earnings. He's described himself as "a billionaire many times over," but who knows? There are skeptics out there who believe Trump has $300 million, tops. And the guy has a reputation for, let's say, shading the news in a light that reflects his enthusiasms.
An April 12, 2004 article, published in Time magazine stated:
How rich is the Donald? To interviewers, he hints that his wealth is somewhere between $2 billion and $6 billion. Rival developers estimate it's nowhere near even the lower figure.
The article continued by reporting on his successful redevelopment of a building at 40 Wall Street, but then balanced it with a report of his casinos "[s]wamped with debt" and the statement that "Trump has become more front man than hands-on developer."
An older Fortune article, published on April 3, 2000, noted that
Trump delights in the sort of elaborate shell games and impenetrably complex deals that frustrate the most conscientious efforts to assess a person's true worth. "It's always good to do things nice and complicated," he once told an interviewer, "so that nobody can figure it out."
That difficulty is compounded by Trump's astonishing ability to prevaricate.. . . . [W]hen Trump says he owns 10% of the Plaza Hotel, understand that what he actually means is that he has the right to 10% of the profit if it's ever sold. When he says he's building a "90-story building" next to the U.N., he means a 72-story building that has extra-high ceilings.
And, finally, defendants point to a January 19, 2000 article in The Wall Street *1101 Journal that noted Trump's boasts of his success but then stated:
But a look at the major sources of his wealth, including the Trump Place apartment development on New York City's west side, the 70-story Trump World Tower project and the midtown General Motors Building, shows that several of his billions are based on profits that are far in the futureand far from guaranteed.
In summary, we find no evidence to support Trump's conclusion that the confidential sources utilized by O'Brien were fictitious. Maressa, supra, 89 N.J. at 198, 445 A.2d 376 (holding that "refusal to name [a] source cannot support an inference that no source existed"). Further we find no evidence to suggest that O'Brien's reliance on the confidential sources suggested actual malice on O'Brien's part under the standards established by Maressa, supra, 89 N.J. at 199-200, 445 A.2d 376, and Sprewell, supra, 841 N.Y.S.2d at 11. We find no basis for Trump's argument that O'Brien had "obvious reasons to doubt the veracity of [his] informants or the accuracy of [their] reports." St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262, 268 (1968). There were no significant internal inconsistencies in the information provided by the confidential sources, nor was there "reliable" information that contradicted their reports, so as to provide evidence of actual malice. Schiavone Constr. Co., supra, 847 F.2d at 1090. Nothing suggests that O'Brien was subjectively aware of the falsity of his source's figures or that he had actual doubts as to the information's accuracy. Lawrence, supra, 89 N.J. at 467-68, 446 A.2d 469 (citations omitted).

IV.
Trump contends additionally that factual issues precluded summary judgment. We concur with Judge Fox's ruling to the contrary. In this regard, Trump claims that defendants' position that Trump refused to provide O'Brien with evidence of the full extent of his liabilities was contradicted by evidence that Trump gave O'Brien "unprecedented access to his finances." However, as we have illustrated previously, the materials that Trump claims to have provided to O'Brien were incomplete and unaudited, and did not contain accurate indications of Trump's ownership interests in properties, his liabilities, and his revenues, present or future. Although O'Brien's access may have been "unprecedented," that term must be interpreted in relation to the access provided to others and not in relation to Trump's entire financial picture.
Trump claims a dispute of fact as to whether O'Brien took notes at meetings with Trump's staff, particularly the meeting of April 21, 2005. However, neither Weisselberg nor Lokey denied that note-taking occurred; they stated only that they did not "recall" note-taking. Moreover, even if a factual dispute existed on this matter, it is not material to the issue of whether Trump can produce clear and convincing evidence of O'Brien's actual malice.
Trump argues that O'Brien told Lokey at the time of the April meeting that he was uninterested in looking at the materials she had compiled because the book had already been written. Further, he contends on the basis of statements of O'Brien's research assistant, Joseph Plambeck, that he investigated only Trump's "Mojo," that O'Brien's statement to the contrary that Plambeck did substantive research into the value of buildings was false and that O'Brien's research was thus inadequate.
However, that argument ignores the fact that O'Brien had been researching and *1102 writing about Trump for years. Moreover, his failure to conduct research could, at most, be considered evidence of negligence, not actual malice. Schiavone Constr. Co., supra, 847 F.2d at 1090 (citing Curtis Publ'g Co. v. Butts, 388 U.S. 130, 153-54, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094, 1110 (1967); Sullivan, supra, 376 U.S. at 287, 84 S.Ct. at 730, 11 L.Ed.2d at 710-11; E.H. McDowell v. Paiewonsky, 769 F.2d 942, 951 (3d Cir.1985)).
Additionally, Trump contends that, despite O'Brien's knowledge that Trump "owned" West Side Yards, O'Brien falsely published in TrumpNation that he did not own the property. However, the evidence is clear that Trump's thirty-percent interest was only in limited partnerships with the Hong Kong owners, and indeed he admitted as much at his deposition. Thus any factual dispute about "ownership" appears a matter of semantics.
Further, Trump admitted in his deposition that, under the partnership agreement, the general partners would have to recover their entire investment before Trump would see any return. As a consequence, his future profits remained speculative. Additionally, the record discloses that the Hong Kong general partners were solely responsible for the sale of the property, and after it was sold by them for $1.76 billion, they were sued by Trump in Federal Court for undervaluing the real estate and thereby reducing his return. What that return would be remains speculative, because encumbrances on the property were not disclosed by Trump.
Trump contends also that O'Brien was motivated by ill will in publishing the information that he did about Trump. However, even if we assume such to be the case, ill will does not constitute actual malice. Maressa, supra, 89 N.J. at 199, 445 A.2d 376. Rather, malice concerns the publisher's "`state of knowledge of the falsity of what he published, not at all upon his motivation in publishing it. . . .'" Lawrence, supra, 89 N.J. at 468, 446 A.2d 469 (quoting Herbert v. Lando, 441 U.S. 153, 199-200, 99 S.Ct. 1635, 1660-61, 60 L.Ed.2d 115, 148-49 (Stewart, J., dissenting) (1979)).

V.
In his third argument, Trump contends that he opposed O'Brien's motion for summary judgment with sufficient direct and circumstantial evidence that O'Brien either knew his source's estimates of Trump's net worth were false, or that O'Brien recklessly disregarded the fact that those estimates were false to support a jury verdict in his favor or, at a minimum, to survive summary judgment. In large measure, we have addressed Trump's arguments elsewhere in this opinion, in particular, his argument that O'Brien had reason to doubt the credibility of his sources and that he published their estimates in reckless disregard of their falsity, his argument that O'Brien purposefully avoided evidence establishing Trump's net worth, and his argument that O'Brien was motivated by ill will.
We reject Trump's additional argument that O'Brien improperly ignored Trump's interest in the "Trump" brand. As Trump's accountants acknowledge in the 2004 Statement of Financial Condition, under generally accepted accounting principles, reputation is not considered a part of a person's net worth.[4]
Trump notes additionally that in the article written three days before the publication *1103 of TrumpNation, O'Brien acknowledged that the value of Trump's casinos had rebounded. However, that statement in itself provides no evidence of actual malice. Moreover, it is difficult to conceive how this evidence of enhanced financial condition could reasonably have been incorporated in a book that had already been printed and was awaiting release.
A further argument is made that, after being provided with an advance copy of the book, Trump and his attorneys alerted the Business Editor of The Times that the book contained glaring falsehoods, and that the editor discussed the matter with O'Brien. Nonetheless, publication occurred. However, the issue is not whether the book contained false statements, but rather, whether it contained defamatory statements made with actual malice. The letters sent to the Business Editor contained no particularized information that would have placed O'Brien on notice as to the inaccuracy of his statements.
As a consequence of the foregoing, we find no triable issue as to the existence of actual malice in this matter, and for that reason, affirm summary judgment for O'Brien. Absent actual malice on his part, respondeat superior liability cannot arise.[5] Thus we find that summary judgment was also properly granted to the publishing defendants.
Affirmed.
NOTES
[1] Warner Books Inc. is now known as Grand Central Publishing, a subsidiary of Hachette Book Group U.S., Inc., the successor to Time Warner Book Group, Inc.
[2] In answers to interrogatories, Trump identified nine allegedly defamatory comments, each of which related to his net worth: (1) the statement that we have quoted, on which this litigation principally focuses; (2) repeated references in the book to Trump's "verbal billions"; (3) a passage stating "[Trump's ability to float above the wreckage of his financial miscues and magically add zeroes to his bank account ensured that he remained an object of fascination"; (4) the October 2005 Times article quoting from TrumpNation; (5) an October 31, 2005 "Squawk Box" interview on CNBC where O'Brien stated that "[Trump has] occupied center stage by adding zeroes here and there and papering over losses"; (6) a second statement in that interview that Trump was "nowhere close" to being worth $2.7 billion; (7) a statement by O'Brien on David Latko's "Money and More" that essentially repeated the anonymously sourced information; (8) a statement at a Coliseum Books event that "[Trump] doesn't have any [money] to invest"; and (9) another statement at that event that "[Trump's] net worth is definitely inflated. Forbes Magazine puts his worth at $2.7 billion, but I am almost certain that is a complete work of fiction."
[3] Trump has not further sought to overcome that privilege.
[4] Trump contends that O'Brien acknowledged that his name was a valuable asset, calling it "bigger than Coke and Pepsi." That statement is incorrect. The claim was reported in a BusinessWeek article as emanating from Trump himself.
[5] We do not address the issue of agency, but note that evidence of such would also be required.